United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 22, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 02-10138

_____

INTERSTATE CONTRACTING CORPORATION,

Plaintiff-Appellee,

versus

CITY OF DALLAS, TEXAS

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before GARZA and CLEMENT, Circuit Judges, and DAVIS[1], District Judge.

LEONARD DAVIS, District Judge:

In this breach of contract and breach of warranty case, the City of Dallas appeals a jury verdict awarding Interstate Contracting Corporation $3,046,964. Because the contract's unambiguous language bars all of ICC's claims, we reverse the trial court's judgment and render judgment that Interstate Contracting Corporation take nothing.

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

1

On September 14, 1994, the City of Dallas, Texas (the "City") and Interstate Contracting Corporation ("ICC") entered into a fixed sum contract for levee construction around a City water treatment plant; the excavation of two areas to create storm water detention lakes; and some miscellaneous work including trash removal, surveying, and linear depth checking. ICC then entered into two written subcontracts with Mine Services, Inc. ("MSI") for the levee construction and the excavation of the storm water detention lake.

To the extent it met specifications, the material excavated for the lakes was to be used as fill material for the levees. In October 1994, MSI began work by mobilizing, surveying, and dewatering the Interior Borrow Lake ("IBL"), one of the "borrow" sites the City designated as a source of fill material. Shortly after work began, MSI discovered that the materials in the IBL were not suitable as fill for the levees, as MSI had expected.

Because the excavation did not yield sufficient quantities of suitable material, MSI manufactured fill material by mixing sand with the limited quantities of clay. This substantially decreased MSI's productivity and increased its costs. The contract did not address manufacturing fill material. The parties discussed using fill from other sites, but MSI believed the contract did not designate those areas as borrow sites. Using those sources was also more expensive than the manufacturing process, and MSI persisted in manufacturing fill.

ICC informed the City of MSI's increased work on March 1, 1995, but the City indicated it would deny ICC's claims. The City, through the claims process, also denied claims for increased

---

[2] This case's background was also detailed in our earlier opinion certifying questions to the Texas Supreme Court, 350 F.3d 539 (2003), and that court's answer, 135 S.W.3d 605 (2004).

costs regarding trash removal, linear depth checking, surveying, removing buried debris, and delay.

ICC filed this suit against the City on MSI's behalf for breach of contract, quantum meruit, breach of implied warranty, and fraudulent inducement.[3] After an eleven day trial, the jury found that the City breached its contract with ICC by failing to pay ICC's additional expenses relating to: (1) unanticipated subsoil conditions, (2) trash removal, (3) linear depth checking, (4) survey costs, and (5) delays caused by the City. The jury also found the City breached an implied warranty to provide accurate and suitable plans and specifications in light of subsoil conditions at the project site. In 2002, the City appealed this judgment, raising sixteen legal and evidentiary issues. Because there was no controlling Texas precedent, this court certified two questions to the Supreme Court of Texas regarding whether ICC could bring these claims on MSI's behalf. 320 F.3d at 539. In 2004, the Supreme Court of Texas answered the certified questions by holding that a general contractor can bring claims on a subcontractor's behalf and setting forth the requirements for doing so. 135 S.W.3d at 605. We issue this opinion resolving the remaining issues presented in this appeal.

## STANDARD OF REVIEW

While we review the trial court's conclusions of law *de novo*, we uphold a jury's verdict unless it lacks a legally sufficient basis. *Hiltgen v. Sumrall*, 47 F.3d 695, 699-700 (5th Cir. 1995); *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982). We review the evidence and all reasonable inferences in the light most favorable to the jury's verdict. *Id.* at 700. Sitting as an *Erie* court, we rule on the issues as the Texas Supreme Court would rule. *Hanson Prod. Co. v. Ams. Ins. Co.*, 108 F.3d 627, 629 (5th Cir. 1997).

## PRINCIPLES OF CONTRACT INTERPRETATION

---

[3] Only the breach of contract and breach of implied warranty claims were presented to the jury.

3

We review the district court's contract interpretation *de novo*. *T.L. James & Co. v. Traylor Bros. Inc.*, 294 F.3d 743, 746 (5th Cir. 2002) (citing *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 563 (5th Cir. 2000)). Accordingly, we "review the record independently and under the same standard that guided the district court." *Id*. (quoting *Am. Totalisator Co. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993)). Under Texas law, determining whether a contract is unambiguous and interpreting an unambiguous contract are questions of law. *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003). The court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written. *Id*. If a question relating to a contract's construction or ambiguity arises, the court examines the contract's wording in context of the surrounding circumstances. *Watkins*, 689 F.2d at 538. If the contract is then susceptible to only one interpretation, it is unambiguous. *Id*. Determining the parties' intent when expressed in an ambiguous contract is a question of fact. *Id*.

## ICC'S STANDING TO BRING MSI'S CLAIMS

Although MSI and the City did not have privity of contract, ICC brought claims against the City on MSI's behalf. The City argues that privity of contract is an essential element to any contract-based action. ICC argues that the district court was correct in allowing ICC to present MSI's claims on a pass-through basis.[4]

Because there was no controlling precedent to determine whether a general contractor could bring pass-through claims against an owner on a subcontractor's behalf, we certified the following

---

[4] "'Pass-through claims' are claims by an allegedly damaged party against an allegedly responsible party with whom it has no contractual relationship. These claims are presented by or through an intervening party in privity with both." Carl A. Calvert & Carl F. Ingwalson, Jr., *Pass Through Claims and Liquidating Agreements*, 18 CONSTR. L. 29 (Oct. 1998). The authors describe the function of "pass-through" claims as: "an attempt by the parties to avoid an extra layer of litigation (*i.e.,* litigation between themselves) with its attendant costs and risks by focusing on the party responsible." *Id.*

4

questions to the Supreme Court of Texas:

> (1) Does Texas law recognize pass-through claims, *i.e.,* may a contractor assert a claim on behalf of its subcontractor against the owner when there is no privity of contract between the subcontractor and the owner?
> If the first question is answered in the negative, then the remaining question need not be reached. However, if the first question is answered in the affirmative, the following question must be reached:
> (2) What are the requirements, if any, that need to be satisfied for a contractor to assert a claim on behalf of its subcontractor when there is no privity of contract between the subcontractor and the owner and who holds the appropriate burden of proof?

320 F.3d at 545.

The Texas Supreme Court answered that Texas law does recognize pass-through claims. 135 S.W.3d at 610-19. In order to bring a pass-through claim, the contractor must still be liable to the subcontractor for the subcontractor's damages:

> In accordance with federal practice and the practice in most states recognizing pass-through claims, we hold that Texas requires that the contractor remain liable to the subcontractor for damages sustained by the subcontractor. If the owner disputes that this requirement has been met, it bears the burden of proving, as an affirmative defense, that the pass-through arrangement negates the contractor's responsibility for the costs incurred by the subcontractor.
> . . . .
> The contractor need not reduce its liability to a binding settlement agreement, however. Conditional liability as expressed in a subcontract, liquidating agreement, or some other type of claims-presentment arrangement is sufficient to prove liability, even when the agreement provides that the contractor has no obligation to pay the subcontractor unless and until it recovers from the owner. The owner disproves the contractor's continuing liability only if it can show that the contractor is not obligated to remit any recovery to the subcontractor.

*Id.* at 619-20 (citations omitted).

The subcontract agreements between ICC and MSI state that ICC is liable to MSI only if the City pays ICC or to the extent ICC is able to recover against the City. In those agreements, ICC was given the sole discretion to bring a claim against the City on behalf of MSI at MSI's expense. If such

5

a suit was brought, MSI agreed to release ICC from further liability in exchange for ICC's recovery from the City. ICC's and MSI's "Claims Presentation and Prosecution Agreement" requires ICC to remit any recovery or payment from the City for MSI's claims to MSI. This satisfies the requirements for ICC to bring MSI's claims against the City.[5] We reject the City's argument.

## LIABILITY FOR THE ACCURACY OF PLANS AND SPECIFICATIONS

### 1. ICC's breach of contract claim related to the plans and specifications

In its first breach of contract claim, ICC contends the plans and specifications the City provided describing the project were defective because they represented that ICC would be able to obtain sufficient levee-fill material from on-site locations. ICC contends the City breached its contract by failing to pay ICC for the additional expenses it incurred because it was unable to obtain sufficient fill from designated borrow areas and was forced to manufacture the fill material. The jury found the City breached the contract by:

> the City's decision not to pay for costs Interstate Contracting claims to have incurred in connection with the provisions of Plan Sheet 10, Section 00220 of the Contract Technical Specifications, Section S-19 of the Information to Bidders, Plan Sheet 14, and/or Items 1.29 and 1.37.2 of the General Provisions of the Contract

and awarded ICC $1,700,000 for this claim.

Plan Sheet 10 included a note disclaiming the subsurface information shown on the plan sheet and encouraging bidders to seek additional information from the City:

> Subsurface information shown on these drawings was obtained solely for use in establishing design controls for the project. The accuracy of this information is not guaranteed and it is not to be construed as part of the plans governing construction of the project. It is the bidder's responsibility to inquire of the City of Dallas if additional information is available, to make arrangements to review same prior to bidding, and to make his own determinations as to all subsurface conditions. Refer

---

[5] To avoid confusion, for the rest of the opinion we will refer to MSI's claims as though they were ICC's claims. We will also refer to ICC and MSI as "ICC."

to Section 00220 - Soils Investigation Data for additional information.

Section 00220 listed several reports that contained the results of soil, subsurface, and geotechnical investigations conducted for the project, stated the reports were available for review at the consulting engineer's office, encouraged bidders to examine this data and make their own investigation of the site prior to bidding, disclaimed any responsibility for the accuracy and interpretations of the soil investigation data, and stated the soil investigation data was not part of the contract. Section S-19 informed the bidders that soil borings were available for viewing at the construction engineer's office.

Plan Sheet 14 stated that:

> All material required to complete the Phase I construction shall be excavated first from the Northeast Borrow Area. When this resource has been excavated to finished grades the remainder of the required material shall be excavated from the Interior Borrow Lake Area. . . .
>
>     . . . .
> All material required to complete Phase 1A construction shall be excavated from the Interior Borrow Lake Area and the channel work adjacent to the levee.

Item 1.29 specified that the contractor could determine the means and methods of construction subject to the City's objections on specified grounds, but the City's exercise or non-exercise of the this right would not create a cause of action for damages or provide the basis for any claim by the contractor against the City. Item 1.37.2 reserved the City's right to change the plans, specifications, and character of the work as necessary, provided that these changes did not materially alter the original plans and specifications or change the general nature of the work as a whole.

The City appeals the jury's verdict on this claim.[6] The City argues that: (1) the contract placed the risk of subsurface conditions on ICC, (2) the contract was incorrectly construed to create a representation as to the adequacy of fill materials located in the two areas Plan Sheet 14 identified

---

[6] Many of the City's sixteen issues relate to multiple claims.

because such a construction ignored another provision identifying additional sources of fill materials, (3) mixing was not contractually required and ICC knew the City inspectors it claimed ordered it to mix materials lacked authority to do so, (4) the City did not have a contractual duty of disclosure regarding subsoil conditions, (5) contract terms precluded any reliance or causation related to subsurface information that the City did or did not disclose, (6) the court improperly gave the jury the role of interpreting the unambiguous contract, and (7) ICC cannot recover because it did not comply with the contract's claim procedures.

ICC maintains the City breached the contract in several different ways. ICC claims that it sought the reports and soil borings referenced in the plans and specifications from the City, but the City did not provide the information ICC requested and failed to disclose all of the relevant reports. ICC contends that Plan Sheet 14 represented that there would be sufficient and suitable fill material in the designated locations. The City argues another part of the contract, which indicated additional borrow areas, took precedence over Plan Sheet 14. ICC claims that the City deprived it of the right to determine the means and methods of construction because the designated borrow sites were insufficient to meet ICC's needs and because the City ordered ICC to mix the excavated materials. ICC also contends that the City materially altered the plans and specifications and changed the general nature of the work by ordering ICC to manufacture fill materials.

## 2. ICC's breach of implied warranty claim

ICC's breach of implied warranty claim is also premised on the City's liability for the accuracy of the plans and specifications. Because the plans and specifications designated several onsite locations from which ICC could obtain fill materials, ICC contends this created an implied warranty that these locations contained suitable fill materials.

8

The jury found that the City breached an implied warranty "to provide to [ICC] accurate and suitable plans and specifications in light of subsoil conditions at the Project" and awarded ICC $1,874,305 for this breach. Because the court found that the damages awarded for the breach of the implied warranty claim and the first breach of contract claim were based on the same underlying facts, the court entered judgment based on the breach of warranty claim, which yielded the larger damage award.

The City appeals the jury's finding on the implied warranty claim. The City contends that: (1) the contract placed the duty to investigate and risk of subsurface conditions on ICC, (2) Texas law does not recognize such an implied warranty, the levees were built according to the plans and specifications, and the contract disclaimed any warranties related to subsurface conditions and placed the risk of subsurface conditions on ICC, (3) the contract was incorrectly construed to create a representation as to the adequacy of fill materials in the areas Plan Sheet 14 identified because such a construction ignored another provision identifying additional sources of materials, (4) the City did not have, and did not breach, a duty of disclosure based on the City's superior knowledge, (5) contract provisions and ICC's actual notice of conditions precluded ICC's reliance on any claimed contractual representations concerning subsurface conditions, and (6) the court erroneously admitted parole evidence to vary unambiguous contract terms and create an implied warranty.

### 3. Texas Law regarding liability for plans and specifications[7]

To determine whether the City can be liable to ICC for inaccurate or defective plans and specifications, which the parties dispute, we must determine whether Texas law recognizes such

---

[7] To avoid confusion, we generically refer to the parties in the following cases as "owner," the party contracting to have work done, and "contractor," the party agreeing to perform the work. These descriptions are not entirely accurate in all of the cases, but the legal principles are the same. Any minor inaccuracies are outweighed by clarity.

liability.[8]  Texas courts have analyzed this issue as a breach of contract claim and as an independent cause of action.  *Compare Lonergan v. San Antonio Loan & Trust Co.*, 104 S.W. 1061, 1067 (Tex. 1907) ("Liability of the builder does not rest upon a guaranty of the specifications, but upon his failure to perform his contract to complete and deliver the structure.") *with City of Dallas v. Shortall*, 114 S.W.2d 536, 540 (Tex. 1938) ("'The suit is not brought to recover anything earned under the contract or for extra work of the character contemplated by the contract; it is brought to recover damages for the misrepresentation by which the contract was induced–or, to express the same substance in another form, to recover damages for not furnishing the agreed site.'") (quoting *Pitt Constr. Co. v. City of Alliance*, 12 F.2d 28, 31 (6th Cir. 1926)).

### a. Lonergan v. San Antonio Loan and Trust Co.

In 1907, the Texas Supreme Court held that a contractor was not excused from performance under a contract to build a house even though the plans provided by the owner were defective. *Lonergan*, 104 S.W. at 1061.  In *Lonergan*, the owner brought suit against the contractor for breach of contract because the contractor abandoned the project after the nearly-completed house collapsed. *Id.*  The contractor answered that the collapse occurred solely because the plans and specifications were defective.  *Id.* at 1062.  The court found that the owner and contractor were each competent to enter into the contract and there was no unfairness in the transaction.  *Id.* at 1065.  The owner was not in a better position than the contractor to discover the plan's defects and there was no express or implied contractual language that would justify the court in concluding that the parties intended the owner to be liable.  *Id*. at 1065-66.  The court held that submitting the plans and specifications for bids did not bind the owner as a guarantor of the specifications.  *Id.* at 1066.  Despite the plans'

---

[8] We assume, without deciding, that the plans and specifications were inherently defective as ICC claims.

inadequacy, the contractor was not excused from his contractual obligation to build the house. *Id.*

at 1067. Thus, under *Lonergan*, in order for an owner to be liable to a contractor for a breach of

contract based on faulty plans, the contact must contain express or implied language that justifies

finding the owner liable.

### b. City of Dallas v. Shortall

In *City of Dallas v. Shortall*, the Texas Supreme Court held that a contractor could not

recover additional costs when the subsoil conditions differed from his expectations, which were based

on plans and specifications provided by the city. 114 S.W.2d at 536. The contractor was responsible

for driving a tunnel through a hill. *Id.* at 537. The plans showed a "rock line" a short depth below

the soil. *Id.* at 542. Even though there was no instrument in north Texas at that time that could test

the soil to the depth of the tunnel, the contractor believed the "rock line" indicated solid rock where

he was to drive the tunnel, which would be easier and less expensive than driving through mixed soil

and rock. *Id*. The court found that the contractor was not attempting to recover under a breach of

contract theory, which *Lonergan* would bar, but was seeking to recover under a misrepresentation-

type theory. *Id.* at 540. The court held that in order for the contractor to recover damages for his

additional expenses, the owner must have stated that the ground was solid rock so affirmatively that

the contractor was justified in relying on the statement without further investigation. *Id*. at 542.

> [I]n order for plaintiff to be entitled to recover damages for extra expenses incurred
> by him as alleged, it must appear that the so-called representation that the tunnel
> could be constructed through solid rock was made as an affirmative statement of fact,
> or as a positive assertion, and made under such circumstances, or with such
> accompanying assurances, as justified plaintiff in relying thereon, without investigation
> on his part; and that he in fact made no independent investigation on his part to
> ascertain the truth.

*Id*. The court found it was conclusively shown that the owner did not make any positive assertions

11

about the soil condition at the tunnel's depth and the contractor was not justified in relying on such a representation. *Id*. at 543. Thus, under *Shortall*, in order for a contractor to recover for expenses caused by defective or misleading plans under a warranty theory, the contractor must show the owner made an affirmative representation, the contractor justifiably relied on this representation, and the contractor performed no further investigation.

### c. Lonergan's and Shortall's Progeny

Texas courts of appeals have continued to analyze the issue under both contract and warranty theories. The intermediate courts have reached varying conclusions on whether, and under which circumstances, a contractor can recover additional compensation because actual conditions differed from those described in owner-provided plans and specifications.[9]

In 1938, the Third Court of Appeals in *Powell v. State* upheld an instructed verdict for the State when a contractor brought suit to recover additional expenses incurred during a highway construction project. 118 S.W.2d 960 (Tex. Civ. App.–Austin 1938, writ ref'd). The contractor argued that the quantities of materials stated in the bid notice constituted warranties by the owner on which the contractor justifiably relied in entering into the contract. *Id.* at 962. The court found the contractor's reliance was not justifiable because the owner, the State, had downgraded the project from a "classified" project to an "unclassified" project. *Id*. at 963.

> Even if the quantities of materials indicated in the notices for bids issued by the Highway Department for letting be treated [sic] as warranties as applied to a "classified" project; when [the contractor] was advised on Friday that such project was to be let as "unclassified," in the light of his own testimony he was then put upon notice that he could not so treat them, and must ascertain the facts for himself.

---

[9] For an additional description of the varying state appellate decisions on this issue, see *IT Corp. v. Motco Site Trust Fund*, 903 F. Supp. 1106 (S.D. Tex. 1994).

12

*Id*. Because the court's decision rested on the contractor's unjustifiable reliance, *Powell* left unresolved whether the plans and specifications could be treated as an affirmative statement on which a contractor can justifiably rely.

In 1971, the Twelfth Court of Appeals in *Newell v. Mosley* found that the plans and specifications did constitute an affirmative representation on which a contractor could rely. 469 S.W.2d 481 (Tex. Civ. App.–Tyler 1971, writ ref'd n.r.e.). In *Newell*, an owner hired a contractor to build a house on the owner's lot according to plans designed by the owner's architect. *Id.* at 481-82. After the parties executed the contract, the contractor visited the lot, discovered that the plans represented the lot was four and half feet wider than it actually was, and realized the house was too large to fit on the lot. *Id*. at 482. The owner refused to pay the contractor the additional costs associated with altering the plans to accommodate the lot's actual size, and the house was never built. *Id*. The owner sued the contractor for breach of contract because the contractor did not build the house as required by the contract. *Id*. The court found the contract was based on a mutual mistake of material fact and rescinded the contract. *Id*. at 482-83. The court then addressed the owner's argument that the contractor's duty to determine whether the house could fit on the lot precluded the contractor's right of rescission. *Id*. at 483. The court found that the contractor "acted on [the owner's] implied warranty that the plans and specifications were sufficient for the purpose in view." *Id*. Citing *Shortall*, the court determined that the "plans submitted by [the owner] constituted a positive assertion that the house could be constructed on the lot. Consequently, [the owner] made a representation upon which [the contractor] had a right to rely without an investigation." *Id*. The contractor was not negligent in not investigating the lot before signing the contract because the contractor justifiably relied on the owner's representation that the house could be built on the lot.

13

*Id.*

Contrary to *Lonergan*, the First Court of Appeals held that an owner's failure to provide correct or adequate plans and specifications constitutes a breach of the contract, entitling the contractor to recover his resulting damages. *City of Baytown v. Bayshore Constructors, Inc.*, 615 S.W.2d 792, 793 (Tex. Civ. App.–Houston [1st Dist.] 1980, writ ref'd n.r.e.). The court's rationale in *Bayshore Constructors* was flawed because the contracts in the cases it relied on expressly required the owner to provide adequate plans. *Id.* at 793-94; *Bd. of Regents of the Univ. of Tex. v. S&G Constr. Co.*, 529 S.W.2d 90, 95 (Tex. Civ. App.–Austin 1975, writ ref'd n.r.e.) (quoting the contract, "The Contractor will be furnished additional instructions and detail drawings as necessary to carry out the work included in the contract."); *see also N. Harris County Junior Coll. Dist. v. Fleetwood Constr. Co.*, 604 S.W.2d 247, 253 (Tex. Civ. App.–Houston [14th Dist.] 1980, writ ref'd n.r.e.) (applying *Lonergan* and finding the owner was liable to the contractor because the contract included the provision, "The Contractor shall not be liable to the Owner or the Architect for any damages resulting from any such errors, inconsistencies or omissions in the Contract Documents"). A year after *Bayshore Contractors*, in a case where the same court had to determine liability for defective plans, as between the contractor, owner, and engineer, the court wrote, "[O]ur courts have recognized that a cause of action exists in favor of a contractor against an owner or architect who furnishes defective plans and specifications." *Turner, Collie, & Braden, Inc. v. Brookhollow, Inc.*, 624 S.W.2d 203, 208 (Tex. Civ. App.–Houston [1st Dist.] 1981) (finding *Lonergan* inapplicable and citing *Bd. of Regents*, 529 S.W.2d at 90 and *Newell*, 469 S.W.2d at 481), *rev'd on other grounds*, 642 S.W.2d 160 (Tex. 1982). Because the court cited *Board of Regents*, a contract case, and *Newell*, which recognized an implied warranty, it is unclear whether the court was recognizing a cause of

14

action in contract or tort.

Not all courts agree that the plans and specifications constitute an affirmative statement on which the contractor can justifiably rely. In *Emerald Forest Utility District v. Simonsen Construction Co.*, the Fourteenth Court of Appeals held a contractor liable under *Lonergan* for his failure to produce a working sewer system despite being provided defective plans by an engineer hired by the owner. 679 S.W.2d 51 (Tex. App.–Houston [14th Dist.] 1984, writ ref'd n.r.e.). The contractor claimed that the utility district warranted the sufficiency of the sewer system design, but the court found the plans were not warranted because the utility district did not expressly guarantee the sewer system design. *Id.* at 52-53. The court further determined that the contractor assumed the risk that the design could be insufficient because the "Instructions to Bidders" included a provision that the contractor should examine the plans, visit the site, and fully inform himself of all matters that could affect the project, and the contractor had an opportunity to do so. *Id.* at 53. Thus, *Emerald Forest* seems to limit any warranties of the plans and specifications to those that are expressly stated in the contract. *Id.* at 54 ("[The contractor] has no breach of warranty action against [the owner] because here [the owner] never warranted the specifications."). The court then ruled that the contractor could not recover under the contract for his additional expenses because the contractor had failed to follow the contract's claim procedures. *Id.* at 54.

That court reached a different result in *Shintech*, in which a contractor sued an owner for breaching a contract that included a provision holding the owner liable for upsetting the contractor's work schedule. *Shintech Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144 (Tex. App.–Houston [14th Dist.] 1985, no writ). The court held the owner breached the contract by upsetting the contractor's work schedule in several ways, including by excessive design errors. *Id.* at 150. The

15

court rejected the owner's argument that the contractor had assumed the risk of defective plans:

> We find no evidence that [the contractor] had knowledge of defective specifications prior to beginning its work. Where the contract is silent on the subject, there is an implied warranty that the plans and specifications for a construction job are accurate and sufficient for the purpose in view.

*Id*. at 151 (citing *Newell*).

In *Millgard Corp. v. McKee/Mays*, another Texas diversity case, we dealt with this issue in the breach of contract context. 49 F.3d 1070 (5th Cir. 1995). In that case, the owner hired the contractor to drill piers for the foundation of a new jail and courthouse. *Id.* at 1071. When sinking the piers, the contractor encountered wet soil, which increased his costs. *Id*. The soil report accompanying the bid documents indicated dry soil conditions, but the bid documents stated this report was not part of the contract documents. *Id*. The bid documents instructed bidders to examine the site and subsurface reports and to decide for themselves the character of the conditions they would encounter. *Id*. In the bid documents and contract, the owner also disclaimed any responsibility for the accuracy of the soil data. *Id*. The contract included a provision allowing price adjustments if the contractor encountered conditions that differed from those indicated in the contract or that differed from conditions that were ordinarily encountered. *Id*. The contractor brought a breach of contract claim based on encountering conditions that varied from those indicated by the contract documents. *Id*. at 1072. We determined the contract's disclaimers and the bid document's language demonstrated that the parties placed the risk of subsurface conditions on the contractor and the contractor could not recover. *Id*. at 1073.

In *Alamo Community College District v. Browning Construction Co.*, the jury found an owner breached a contract by failing or refusing to correct design errors. 131 S.W.3d 146, 154-55 (Tex. App.–San Antonio 2004, pet. filed). Relying on *Lonergan* and its progeny, the Fourth Court of

16

Appeals upheld the jury's verdict because the parties intended to contractually shift the risk of design errors to the owner. *Id*. The contract included a provision stating, "The Contractor shall not be liable to the Owner or Architect for damage resulting from errors, inconsistencies or omissions discovered [in the contract documents]." Under *Lonergan*, the court found this language indicated the owner had a contractual responsibility for any design errors. *Id*. at 156.

## 4. ICC's breach of contract claims

### *a. Analyzed under Lonergan*

Some Texas courts apply the *Lonergan* rule in its purest form–contractual language, express or inferred, must evidence an intent to shift the burden of risk to the owner for the contractor to recover for breach of contract based on defective plans and specifications. Other courts infer that intent if the contract is silent on the issue of risk. We conclude the Texas Supreme Court would require contractual language indicating an intent to shift the burden of risk to the owner in order to find an owner breached a contract by providing defective plans. The contrary rule is simply not well reasoned. The holding in *Bayshore Constructors*–that failing to provide adequate or correct plans and specifications is a breach of contract in and of itself–is questionable. *Bayshore Constructors* relied on *Board of Regents* and *North Harris County*, both of which placed the burden of risk on the owner because the contracts indicated an intent to shift the risk of inadequate plans to the owners. *Board of Regents* and *North Harris County* reflect the *Lonergan* rule requiring contractually demonstrable intent to shift the risk to the owner; they do not hold, as *Bayshore Constructors* relies on them for, that providing inadequate plans by itself is a breach of contract. Accordingly, we apply the *Lonergan* rule to determine whether the City breached its contract with ICC.

In order for an owner to breach a contract by suppling inadequate plans to a contractor,

17

*Lonergan* and its progeny require that the contract evidence an intent to shift the burden of risk of inadequate plans to the owner. *See Lonergan*, 104 S.W. at 1065-66. Although the jury found ICC did not assume this risk, we give that determination no weight if the contract is unambiguous on the issue. We review the district court's contract interpretation *de novo*. *T.L. James*, 294 F.3d at 746.

The contract contained several provisions disclaiming the adequacy of the plans and specifications and placing the risk on ICC that the conditions may vary from its expectations:

> ITEM 1.21 CONTRACTOR'S WARRANTIES AND UNDERSTANDING
>  . . . .
> By executing the contract, the CONTRACTOR represents that he has visited the site of work, has fully familiarized himself with the local and on-site conditions under which the work is to be performed and has correlated his observation with the requirements of the contract documents. In addition, the CONTRACTOR represents that **he has satisfied himself as to subsurface conditions at the site of the work**. Information, data and representations contained in the contract documents pertaining to the conditions at the site, **including subsurface conditions, are for information only and are not warranted or represented** in any manner to accurately show the conditions at the site of the work. The CONTRACTOR agrees that he shall make no claims for damages, additional compensation or extension of time against the OWNER because of encountering actual conditions in the course of the work which vary or differ from conditions or information contained in the contract documents. **All risks of differing subsurface conditions shall be borne solely by the CONTRACTOR.**
>
> ITEM 1.22.1 PERFORMANCE OF THE WORK: In addition to those matters elsewhere expressly made the responsibility of the CONTRACTOR, the CONTRACTOR shall have the full and direct responsibility for the performance and completion of the work under this contract and for any act or neglect of the CONTRACTOR, his agents, employees or subcontractors. **He shall bear all losses, if any, resulting on account of the amount and character of the work, or because the conditions under which the work must be done are different from what were estimated or anticipated by him**, or because of weather, floods, elements or other causes.
>
> ITEM 1.3 EXAMINATION OF PLANS, SPECIFICATIONS AND SITE OF THE WORK
> BIDDERS are advised that the plans, specifications and other documents on file as stated in the advertisement shall constitute all the information which the OWNER shall furnish. **BIDDERS are required**, prior to submitting any proposal, to review the plans and read the specifications, proposal, contract and bond forms carefully; **to visit the site of the work; to examine carefully local conditions; to inform themselves**

**by their independent research, tests and investigations of the difficulties to be encountered and judge for themselves the accessibility of the work and all attending circumstances affecting the cost of doing the work** or time required for its completion; and to obtain all information required to make an intelligent proposal.

No information given by the OWNER or any official thereof, other than that shown on the plans and contained in the specifications, proposals and other contract documents, shall be binding upon the OWNER. **BIDDERS shall rely exclusively upon their own estimates, investigations, tests and other data** which are necessary for full and complete information upon which the proposal may be based. Any bidder, by submitting his bid, represents and warrants: that he has prepared his bid in accordance with the specifications, with full knowledge and understanding of the terms and provisions thereof; that he has reviewed, studied and examined the bid prior to the signing and submission of same; and that he was cognizant of the terms of his proposal, verified his calculations and found them to be correct and agrees to be bound thereby.

(emphasis added). These provisions show that the parties intended to place the burden of risk for inadequate plans on ICC. This situation is similar to *Millgard*–where the bid documents and contracts clearly placed the burden of risk on the contractor–and dissimilar to *Shintech*–where the contract was silent on which party bore the risk of defective plans–and *Alamo Community College*– where the contract shifted the risk to the owner. Here, the contract expressly and unambiguously placed the risk on ICC.

ICC attempts to distinguish *Millgard* because in that case, the soil reports were specifically excluded from the contract documents. *See Millgard*, 49 F.3d at 1073. Although the soil reports were not integrated into the contract, the "disclaimers and the language of the project manual show that the parties placed the risk of underground water on [the contractor]." *Id.* Similarly, here the contract documents demonstrate the parties' intent to place the risk on ICC irrespective of whether the plans and specifications were included in the contract documents.

In support of the jury's verdict, ICC argues that the City contractually guaranteed the plans and specifications:

1.20.3 ERRORS AND CORRECTIONS IN DRAWINGS AND SPECIFICATIONS: The CONTRACTOR shall not take advantage of any apparent errors, omissions or discrepancies in the drawings or specifications; and the Engineer shall be permitted to make such corrections or interpretations as may be necessary for the fulfillment of the intent of the contract documents. In case of any errors, omissions or discrepancies in the drawings or specifications, the CONTRACTOR shall promptly submit the matter to the OWNER who, in turn, shall promptly make a determination and issue the necessary instructions in writing. Any adjustment by the CONTRACTOR without this determination and instructions shall be at the CONTRACTOR'S own risk and expense. The work is to be made complete as intended by the contract documents.

ITEM 1.3 EXAMINATION OF PLANS, SPECIFICATIONS AND SITE OF THE WORK
. . . .
No information given by the OWNER or any official thereof, other than that shown on the plans and contained in the specifications, proposals and other contract documents, shall be binding upon the OWNER. . . .

ICC argues these provisions are similar to provisions the courts used in *North Harris County* and *Emerald Forest* to place liability on the owner, but those cases are distinguishable.

The *North Harris County* contract provided, "The Contractor shall not be liable to the Owner or the Architect for any damages resulting from any such errors, inconsistencies or omissions in the Contract Documents." *N. Harris County*, 604 S.W.2d at 253. That provision expressly shifted the risk off the contractor and on to the owner for any errors in the contract documents that the contractor brought to the owner's attention. *Id.*

In *Emerald Forest*, after the appellate court found the contractor assumed the risk of insufficient designs, it turned to the contractor's argument that he was not liable because he had notified the engineer and owner about the deficiencies and requested a design change. *Emerald Forest*, 679 S.W.2d at 54. The contractor relied on a contract provision providing, "The Contractor will promptly notify the Owner and Engineer in writing of any subsurface or latent physical conditions at the site differing materially from those indicated in the Contract Documents." *Id.* The appellate

20

court found this defense would relieve the contractor of liability, but the contractor did not provide the notice in writing as required. *Id*.

Although the contract in *Emerald Forest* included language requiring the contractor to visit and investigate the work site, it did not include provisions in which the owner disclaimed the plans. We read Items 1.20.3 and 1.3 in the entire contract's context. Item 1.20.3, unlike the provision in *North Harris County*, does not expressly relieve the contractor of liability for errors, omissions, or discrepancies in the plan documents, but gives the City the right to determine whether further instructions are necessary if the contractor brings the alleged errors to the City's attention. When read in its context, Item 1.3 does not evidence the City's intent to warrant the contract documents, but to disclaim any information provided by the City outside of the contract documents. These provisions are not inconsistent with the evidenced intent that ICC bear the risk of insufficient plans and specifications.

Accordingly, the contract is unambiguous in placing the risk of defective plans and specifications on ICC. The City did not breach the contract by providing ICC with defective plans because ICC assumed that risk. "The bargain struck by the parties allocated the risk and there it ends. We enforce the contract." *Millgard*, 49 F.3d at 1073.

### *b. ICC's other breach of contract claims related to subsoil conditions*

As stated above, the jury found the City breached the contract by

> the City's decision not to pay for costs Interstate Contracting claims to have incurred in connection with the provisions of Plan Sheet 10, Section 00220 of the Contract Technical Specifications, Section S-19 of the Information to Bidders, Plan Sheet 14, and/or Items 1.29 and 1.37.2 of the General Provisions of the Contract.

Besides what has already been discussed, there are two other ways to interpret the jury's verdict on this claim because the jury question was phrased with "and/or." The jury's verdict for ICC could

21

have been based on the City's failure to provide ICC with the soil reports referenced in the bid documents or on the City's alleged order to ICC to mix materials.

*i. Did the City breach the contract by failing to provide ICC soil information?*

ICC claims that the City's failure to provide the soil information referenced in Plan Sheet 10, Section 00220, and Section S-19 breached the contract. The City argues it did not breach the contract by failing to provide ICC soil information. Again, the contract's disclaimers are controlling. Despite the City's alleged failure to provide ICC with the information it requested, ICC bid on the project and warranted that it had satisfied itself as to the project site's condition.

ITEM 1.21 CONTRACTOR'S WARRANTIES AND UNDERSTANDING

By executing the contract, . . . **the CONTRACTOR represents that he has satisfied himself as to subsurface conditions at the site of the work**. . . . The CONTRACTOR agrees that he shall make no claims for damages, additional compensation or extension of time against the OWNER because of encountering actual conditions in the course of the work which vary or differ from conditions or information contained in the contract documents. All risks of differing subsurface conditions shall be borne solely by the CONTRACTOR.

ITEM 1.3 EXAMINATION OF PLANS, SPECIFICATIONS AND SITE OF THE WORK

**BIDDERS are required, prior to submitting any proposal, . . . to visit the site of the work; to examine carefully local conditions; to inform themselves by their independent research, tests and investigations of the difficulties to be encountered and judge for themselves the accessibility of the work and all attending circumstances affecting the cost of doing the work or time required for its completion; and to obtain all information required to make an intelligent proposal**.

. . . BIDDERS shall rely exclusively upon their own estimates, investigations, tests and other data which are necessary for full and complete information upon which the proposal may be based. Any bidder, by submitting his bid, represents and warrants: that he has prepared his bid in accordance with the specifications, with full knowledge and understanding of the terms and provisions thereof; that he has reviewed, studied and examined the bid prior to the signing and submission of same; and that he was cognizant of the terms of his proposal, verified his calculations and found them to be correct and agrees to be bound thereby.

(emphasis added). ICC waived any right to claim the City breached the contract by not providing the

22

soil reports when ICC chose to bid on the project without the reports. ICC was not forced to bid on this project, but chose to do so knowing it did not have all of the information it wanted. In doing so, it assumed the risk that the site's conditions might differ from its expectations. Accordingly, we accept the City's argument.

> *ii. Was the City's order to mix materials, if such an order was given, a material change to the contract and therefore a breach?*

Item 1.29 gave ICC the right to determine the method and means of construction, subject to the City's objections. Item 1.37.2 reserved for the City the right to change the plans, specifications, and character of the work as necessary, so long as these changes did not materially alter the original plans and specifications or change the general nature of the work as a whole. ICC contends that the City breached the contract by ordering it to mix materials in order to obtain sufficient fill material for the levees. The City argues that it did not order ICC to mix materials and, even if such an order was given, it would not have been an alteration of the general nature of the work.

Assuming, without deciding, that the City did order ICC to mix materials to produce adequate fill material, the City's order was not a breach of contract. ICC contracted with the City to excavate certain areas and, to the extent possible, use the excavated materials to construct levees. In this situation, mixing excavated materials to create sufficient fill material is not a material change to the general nature of the work. *Cf. Brown-McKee, Inc. v. Western Beef, Inc.*, 538 S.W.2d 840, (Tex. Civ. App.–Amarillo 1976, writ ref'd n.r.e.) (determining work was not "extra work" because "the work and consequent expense incurred in digging in rock was necessary in the performance of the very thing which Brown-McKee contracted to do. It was an incident of the construction."). Mixing materials is also not a material change to the plans and specifications. *Cf. City of Houston v. L.J. Fuller, Inc.*, 311 S.W.2d 285, 290 (Tex. Civ. App.–Houston 1958, no writ) ("Extra work is work

23

arising outside of and independent of the contract; something not required in its performance. Additional work is that required in the performance of the contract and without which it could not be carried out."). As mixing materials was nothing more than what was required to complete the contract, it could not have been a material change to the plans and specifications nor a change in the general nature of the work.

Further, as explained above and below, ICC assumed the risk of obtaining inadequate fill material from the designated borrow areas. In Item 1.22.1, ICC acknowledged that it would "bear all losses, if any, resulting on account of the am ount and character of the work, or because the conditions under which the work must be done are different from what were estimated or anticipated by [it] . . . ." ICC's argument ignores the co ntractual disclaimers and is premised on an implied warranty guaranteeing the site conditions, which we reject. As the City did not warrant the fill materials' suitability, mixing the materials to make them suitable was not a material change to the plans and specifications or to the general nature of the work. Accordingly, we reject ICC's argument.

### 5. ICC's breach of implied warranty claim

To recover under a breach of warranty claim, the Texas Supreme Court held in *Shortall* that a contractor must show the owner made an affirmative representation, the contractor justifiably relied on this representation, and the contractor performed no further investigation. *Shortall*, 114 S.W.2d at 542. Texas intermediate courts have since split on whether the plans and specifications themselves constitute an affirmative representation on which a contractor can justifiably rely. *Newell*, which did not address the effect of disclaimers, held that plans and specifications can constitute an affirmative statement on which a contractor could rely. *Newell*, 469 S.W.2d at 483. *Shintech*, citing *Newell*, limited this implied warranty to when the contract is silent regarding risk. *Shintech*, 688 S.W.2d at

24

151. According to *Newell* and *Shintech*, the plans and specifications satisfy *Shortall's* requirement for an affirmative representation, but *Shintech* assumes justifiable reliance only when the contract is silent as to risk. Thus, regardless of whether the plans themselves constitute an affirmative statement, a contractor's reliance may not be justifiable if the contract specifically allocates the risk of defective or inadequate plans.

ICC claims an implied warranty existed that the designated borrow sources would provide sufficient fill material. Assuming, without deciding, that the plans were an affirmative statement that the areas designated in Plan Sheet 14 contained sufficient and suitable fill material, the City is not liable if ICC's reliance on that representation was not justifiable. Given the disclaimers described above, ICC's reliance was not justifiable.

In *IT Corp.*, in which the contractor sued the owner to recover for unexpected site conditions related to a environmental remediation work, the court concluded that the parties intended the contractor to rely on the site information provided by the owner. *IT Corp.*, 903 F. Supp. at 1126. The owner had expressly stated that the information was sufficient for bid preparation and contractually precluded additional compensation only for those conditions that could be visually inspected. *Id.* The contract intended bidders to make only a visual inspection of the site and did not require bidders to perform their own investigation to determine whether the owner-provided information was accurate. *Id.* at 1123. Citing *IT Corp.*, ICC claims that standard disclaimer clauses do not vitiate implied warranties regarding data accuracy or plan sufficiency. *Id.* at 1126.

*IT Corp.* distinguished the disclaimers in *Emerald Forest*, which are more similar to the disclaimers before us. *See id.* In *Emerald Forest*, the "Instructions to Bidders" required bidders to "visit the site of the work, and fully inform themselves as to all conditions and matters which can in

25

any way affect the work or costs thereof." *Emerald Forest*, 679 S.W.2d at 53; *see IT Corp.*, 903 F. Supp. at 1123. Before submitting a bid, ICC was required to investigate the project site and:

> to visit the site of the work; to examine carefully local conditions; to inform themselves by their independent research, tests and investigations of the difficulties to be encountered and judge for themselves the accessibility of the work and all attending circumstances affecting the cost of doing the work or time required for its completion; and to obtain all information required to make an intelligent proposal.

Item 1.3.

Citing *North Harris County* and *IT Corp.*, ICC also argues that the City should be held liable because the City had superior knowledge regarding the materials available at the borrow sites. In *IT Corp.,* the court did find that the owner possessed superior knowledge and the contractor may have had a breach of contract claim because the owner provided inaccurate data. *IT Corp.*, 903 F. Supp. at 1126-27. The court then reasoned that, even if the parties did intend to place the risk on the owner, the contractor must still prove, among other things, that his reliance on the plans and specifications was justifiable. *Id.* at 1127. As discussed above, ICC's reliance was not justifiable given the contract's disclaimers. *North Harris County* is also inapposite because there the contract evidenced the parties' intent that the owner would guarantee the specifications' sufficiency. *N. Harris County*, 604 S.W.2d at 253. We have already discussed the reasons for finding that this contract does not evidence such an intent.

Accordingly, even if the contract documents were an affirmative statement that the project could be completed according to the plans, ICC was not justified in relying on such a statement given the contract's disclaimers. "When advised that he must determine these facts for himself, and be bound by his contract in any event, he could have either refrained from bidding or sought additional time in which to make tests of the area himself." *Powell*, 118 S.W.2d at 963.

26

## ICC'S REMAINING BREACH OF CONTRACT CLAIMS

In addition to the breach of contract claim discussed above, the jury found the City breached the contract by not paying ICC for: (1) the removal of trash and man-made waste at the project site, (2) the costs of checking the depth of an impervious liner, (3) additional survey costs, and (4) expenses ICC incurred because its work on the project was delayed or hindered. The City argues these claims are barred because ICC did not comply with the contractual claims and notice requirements. The jury found that ICC substantially complied with the contract's claim procedures requiring notice of claims for additional compensation, but that ICC did not literally comply with those provisions.

The City argues that compliance with the claim procedures is a condition precedent to payment on the claims. To determine whether a condition precedent is present, a court examines the parties' intent as manifested in the contract. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Typically, terms such as "if," "provided that," "on condition that," or similar terms must be used in the contract to support finding a condition precedent. *Id.* The law does not favor conditions, and when the parties' intent is ambiguous the terms will be construed as covenants. *Id.* Items 1.37.5 and 1.39, which discuss the claims process, specifically use the words "condition precedent" to describe their requirements for a claim above the contract price to be accepted and paid. Accordingly, despite the law's disfavor of conditions precedent, we recognize them here.

The jury found ICC did substantially comply with the claims process, but the City argues that this question should not have been submitted to the jury because the contract required strict compliance with the claim procedures. Substantial compliance excuses deviations from a contract's

27

provisions that do not severely impair the contractual provision's purpose and is the legal equivalent of compliance unless otherwise provided. *Hall v. Resolution Trust Corp.*, 958 F.2d 75, 79 (5th Cir. 1992) (applying Texas law); *Burtch v. Burtch*, 972 S.W.2d 882, 889 (Tex. App.–Austin 1998, no pet.). Although Item 1.39 contemplates substantial performance to the extent that it rejects oral appeals as substantial compliance with the contract's written-appeals requirements, Items 1.37.5, 1.39, 1.40, and 1.48 expressly require strict compliance with the claim procedures. Accordingly, because the contract expressly requires strict compliance, substantial compliance is not the legal equivalent of compliance. The jury found that ICC did not comply with the claims process; thus, ICC did not satisfy the condition precedent for payment on its claims for additional compensation. *See Emerald Forest*, 679 S.W.2d at 54 (finding that the contractor's failure to comply with contract provisions precluded recovery).

ICC's contention that it did not have to comply with the claim procedures because the claims were not for extra work, but for damages, is without merit. The contract required that all claims brought under the contract, for breach of the contract, and for additional compensation comply with the contract's claims requirements.

> Item 1.48 CLAIMS AGAINST OWNER AND ACTION THEREON
> No claim against the OWNER **under the contract or for breach of the contract or additional compensation for extra or disputed work shall be made or asserted** against the OWNER under the contract or in any court action **except pursuant to the provisions of Items 1.38, 1.39, and 1.40, and unless the CONTRACTOR shall have strictly complied with all requirements** relating to the giving of notice and information with respect to such claim as required under said sections.

(emphasis added). Thus, regardless of how ICC characterizes its claims, ICC was still required to comply with the contractual claims process.

ICC argues that the City's breach of contract precluded the City from denying payment

28

because ICC failed to strictly comply with the claim procedures. But this argument is inapplicable because the City did not breach the contract. Similarly, because the City did not guarantee the plans and specifications, ICC's contention that the deficient plans and specifications so altered the nature and scope of the work such that it was impossible for ICC to comply with the claims procedures is also without merit.

ICC also contends that the City did not comply with the claims process, excusing ICC from strict compliance. While the contract did require the City to respond to ICC's claims in a certain manner, the contract only required strict compliance from ICC. The contract also provided that the City's conduct shall not be construed as waiving the claims requirements. ICC did not request jury findings on whether the City failed to comply with the claim procedures or whether the City waived the claims procedures requirements. Accordingly, ICC waived this as a defense to ICC's noncompliance. Because ICC failed to comply with the contractually required claim procedures, its remaining claims are barred.

## CONCLUSION

This case is decided on one of contract law's most basic principles–an unambiguous contract will be enforced as written. Although the jury found for ICC on both its breach of contract and implied warranty claims, the parties contractually and unambiguously agreed that ICC would bear the risk of defective plans and specifications. ICC's remaining contract claims are barred by ICC's failure to comply with the contractual claims process. Consequently, we reverse the trial court's judgment and render judgment that ICC take nothing.