Opinion
issued May 6, 2010








 

 

 

 

                  















 

     

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00319-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MASTEC NORTH AMERICA, INC. AND MASTEC, INC.,
Appellants

 

V.

 








EL PASO FIELD SERVICES, L.P. AND
GULFTERRA SOUTH TEXAS, L.P.  F/K/A EL
PASO SOUTH TEXAS, L.P., Appellees

 

 

 

 



On Appeal from the 334th District Court

Harris County, Texas

Trial Court Cause No. 2004-39579

 

 

 



OPINION ON REHEARING

 








          This is a breach of contract dispute
brought by appellants, MasTec North America, Inc., and MasTec, Inc.
(collectively, “MasTec”), against appellees, El Paso Field Services, L.P. and
Gulfterra South Texas, L.P., f/k/a El Paso South Texas, L.P. (collectively, “El
Paso”).  El Paso engaged MasTec to
replace a butane pipeline for a lump sum of $3.6 million, known
as the “Butane Shuttle Replacement Project” (“Project”).  MasTec submitted its bid on the Project based
on information in El Paso’s bid package, which included, inter alia, the
“Station and Land Pipeline Construction Contract” (“Contract”) and El Paso’s
specifications, which were incorporated into the Contact.  In the Contract specifications, El Paso
asserted that it used due diligence in locating any “foreign crossings”[1]
in the pipeline right-of-way and that there were 280 such crossings.  During construction, however, MasTec
encountered 794 foreign crossings, which required additional construction
measures and increased its costs substantially. 
MasTec sued El Paso to recoup the additional expenses.  A jury found that El Paso breached the due
diligence provision of the Contract specifications and awarded $4,763,890 in
damages to MasTec.  Subsequently, on the
motion of El Paso, the trial court granted judgment notwithstanding the verdict
(“JNOV”) in favor of El Paso, concluding that the lump-sum provisions of the
Contract allocated the risk of unidentified foreign crossings to MasTec and
holding that MasTec take nothing by its claims. 
MasTec appeals.

          In its sole issue, MasTec contends
that the trial court erred by granting JNOV in favor of El Paso because the
trial court’s interpretation of the Contract improperly rendered the due
diligence provision a nullity and shifted the risk of costs associated with
unidentified foreign crossings to MasTec. 
In the alternative, MasTec contends that (a) the Contract is ambiguous
and must be strictly construed against El Paso, or (b) that MasTec is entitled
to recover under its quantum meruit theory.

          On July 23, 2009, we reversed and remanded
for entry of judgment consistent with the jury’s verdict and for assessment of attorney’s
fees in favor of MasTec.  El Paso moved
for rehearing. We grant the motion, withdraw the opinion dated July 23, 2009,
and issue this opinion in its stead.  Our
disposition and judgment remain unchanged.

          We reverse and remand for entry of
judgment consistent with the jury’s verdict and for assessment of attorney’s
fees in favor of MasTec.

FACTS AND PROCEDURAL HISTORY

          El Paso is one of the world’s largest
energy companies.  MasTec is a
construction company that was established in the 1930s and has annual gross
revenue exceeding $1 billion.

          At the time of the events, El Paso
owned a butane pipeline that extended from Houston to Corpus Christi.  The pipeline was originally constructed in
the 1940s as an emergency supply line during the war.  Because of its age and because it was deemed
too shallow (buried less than 12 inches underground), El Paso contracted for
its replacement, which took place in phases. 
This lawsuit involves Phase II of the replacement—a 68-mile, 8-inch
diameter line extending from Victoria to Nueces Bay.[2]

          El Paso invited MasTec to bid on the
replacement Project, which was to include removal of the existing pipeline and
the construction of a new pipeline in the same location.  MasTec hired Bill White, who is considered by
MasTec to be “a pipeline-construction veteran,” as its general manager.  White attended El Paso’s “pre-bid meeting” on
April 22, 2003, at which El Paso distributed bid packages containing the job
description, the location of the pipeline, drawings or maps, known as
“alignment sheets,” and the Contract. 

 

          According to El Paso’s bidding
instructions, “The Contractor’s bid shall be based on the Contract documents as
issued, without modifications.  All
clarifications or changes during the bid period will be communicated to all
Contractors. . . . Significant exceptions to the provisions of the Proposed
Contract documents may cause rejection of the bid. . . . The Scope of Work is
believed to be complete.”

          The purpose of the alignment sheets
was to show “foreign crossings,” which are obstacles that cross the pipeline
right of way—such as other pipelines, utilities, roads, rivers, fences, wells,
cables, and concrete structures.  Substantial
costs are involved in maneuvering around these structures during pipeline
construction and de-construction.  El
Paso had hired Gullett & Associates, an engineering company, to produce the
alignment sheets.

          The invitation to the pre-bid meeting
stated, “No guided tour of the proposed pipeline is now scheduled.  Each contractor will be required to review
the construction requirements individually. 
Aerial inspection is highly recommended.” At the meeting, Jackie Ross,
who was initially a consultant to El Paso and later became the full-time
assistant to the project manager on this Project, told the contractors that El
Paso would normally conduct a tour of the pipeline, but that there would be too
many cars in this case and that each of the contractors was encouraged to “fly
the route.” 

          After the pre-bid meeting, White and
his son, Mike, flew by helicopter over the pipeline route, familiarizing
themselves with the topography and landing several times to check soil
conditions.  Mike testified by deposition
that he carried the alignment sheets in his lap during the flight for
orientation, but that he could not see foreign crossings from the air.  White also drove along portions of the
pipeline to which he had access. 
According to White, MasTec and the other contractors were specifically
prohibited from entering certain private properties along the route, including
the O’Connor Ranch.  El Paso later
claimed that the contractors were permitted to enter the restricted areas for
inspection if they arranged for an escort by an El Paso representative.  

          Pursuant to El Paso’s written bidding
instructions, MasTec’s bid and completed Contract, including lump-sum price
schedule, were due 12 business days later, on May 8, 2003.  This date was later amended to May 15, 2003.

The
Contract and Specifications

          The Contract, which MasTec was to sign
and submit with its bid, provides as follows, in pertinent part:

          2.1     SCOPE
OF WORK

[MasTec] agrees, at its cost, that it shall (except as
otherwise provided for in the Contract or Drawings) furnish all necessary
materials, supplies, labor, tools, equipment superintendence, apparatus and
machinery, including without limitation, transportation and all other items
necessary to perform the Work for the construction and completion of, and shall
construct, install, complete, and deliver to [El Paso] in a good and
workmanlike manner, in strict compliance with the Contract and all applicable
laws, rules, regulations, ordinances and permits, all of the Work set forth in
Exhibit “A,” “Scope of Work and Addendums” (attached hereto), all in accordance
with the provisions of this Contract.  

          . . . .

          4.1     COMPENSATION

For and in consideration of the performance of the
Work by [MasTec] and subject to the terms and conditions of this Contract, [El
Paso] agrees to pay and [MasTec] agrees to accept compensation as set forth in
the attached Exhibit “B-1,” Contract Price Schedule.

          . . . . 

          4.6     COMPENSATION
FOR DELAYS IN PERFORMANCE OF WORK

          a)       By
[MasTec]: All delays in the performance of the Work resulting from causes other
than those attributable to [El Paso] shall be at the cost and expense of
[MasTec]. . . .

          b)      By
[El Paso]: For delays in the performance of the Work attributable to [El Paso],
it is agreed that the compensation and/or amounts due [MasTec] in full and
complete settlement of such delays shall be as follows: [various lump sum
settlement or reimbursement options].

          . . . .

          7.1     REPRESENTATIONS
AND WARRANTIES

          . . . . 

          e)       [MasTec
represents] [t]hat its duly authorized representative has visited the site of
the Work, is familiar with the local and special conditions under which the
Work is to be performed and has correlated the on site observations with the
requirements of the Contract and has fully acquainted itself with the site,
including without limitation, the general topography, accessibility, soil
structure, subsurface conditions, obstructions and all other conditions
pertaining to the Work and has made all investigations essential to a full
understanding of the difficulties which may be encountered in performing the
Work, and that anything in this Contract or in any representations, statements
or information made or furnished by [El Paso] or any of its representatives
notwithstanding, [MasTec] assumes full and complete responsibility for any such
conditions pertaining to the Work, the site of the Work or its surroundings and
all risks in connection therewith;

          f)       That
it possesses a high level of experience and expertise in the business,
administration, construction management and superintendence of projects of the
size, complexity and nature of the Work and that it will perform the Work with
the care, skill and diligence of such a Contractor;

          g)       That
the Contract is sufficiently complete and detailed for [MasTec] to perform the
Work required to produce the results intended by the Contract and comply with
all the requirements of the Contract; . . . 

          8.1     CONTRACTOR’S
CONTROL OF THE WORK

          a)       .
. . .

          . . . .

7.      [MasTec]
represents that it has had an opportunity to examine, and has carefully
examined, all of the Contract documents and has fully acquainted itself with
the Scope of Work, design, availability of materials, existing facilities, the
general topography, soil structure, substructure conditions, obstructions, and
all other conditions pertaining to the Work, the site of the Work and its
surroundings; that it has made all investigations essential to a full
understanding of the difficulties which may be encountered in performing the
Work; and that anything in any of the Contract documents or in any
representations, statements or information made or furnished by [El Paso] or
its representatives notwithstanding, [MasTec] will regardless of any such
conditions pertaining to the Work, the site of the Work or its surroundings,
complete the Work for the compensation stated in this Contract, and pursuant to
the extent of [MasTec’s] liability under this Contract, assume full and
complete responsibility for any such conditions pertaining to the Work, the
site of the Work or its surroundings, and all risks in connection
therewith.  In addition thereto, [MasTec]
represents that it is fully qualified to do the work in accordance with the
terms of this Contract within the time specified.

          . . . .

          24.1   EXHIBITS

The following Exhibits are included herein by
reference, are attached hereto and shall become a part of this Contract for all
purposes:

                   .
. . . 

                   Exhibit
“B-1”       Contract Price Schedule

                   .
. . . 

                   Exhibit “C”          Construction Specifications

           . . . .

          25.1   ORDER

                   .
. . . 

                   b)      . . . The Specifications, Drawings, Exhibits, and all
supplemental documents are essential parts of the Contract, and a requirement
appearing in one is as binding as though appearing in all.  They are intended to be complementary, to
describe and provide a complete Work.

          . . . .


          28.1   AGREEMENT

This Contract, together with all Exhibits and
attachments, constitutes the entire Contract agreement between the parties
relating to its subject matter and no other conversations, bid, memoranda or
other matter between the parties relating to the subject matter of this
Contract, oral or written, exchanged before execution of this Contract shall
vary, alter or be used to interpret the terms of this Contract.

 

          Pursuant to Exhibit B-1 of the
Contract, “Contractor’s Proposal,” MasTec agreed to perform “everything
necessary to complete, satisfy, and discharge all Work and obligations imposed
on [MasTec] connected with the performance of the Work,” including, as follows:

Furnish all labor,
equipment and materials as described in the Specifications for all Work
necessary to perform the following applicable Work as shown on the Drawings,
including but not limited to: loading, hauling, unloading, storing, clearing,
excavating, including rock if encountered, cutting and beveling of pipe;
installing pipe or valves, where required; removing pipe or valves, where
required; welding (including tie-in and transition welds, if required);
coating, repairing coating, furnishing and installing padding when applicable;
installing concrete supports; blow-offs, bypasses, bolting, bracing hydrostatic
testing of completed assemblies, painting of newly installed piping assemblies
and cleanup.

          . . . .

Any Work required to complete installation of the new
pipeline but not shown as a pay item is no less included in the scope of work
for installation of the new 8-inch Butane Shuttle pipeline and is included in
[MasTec’s] lump sum proposal.  Just
because an item of Work is not specifically identified, does not mean such Work
is not included in [MasTec’s] scope of Work. 
Any item of Work [MasTec] knows is required for completion of the
installation but not specifically identified is to be included in [MasTec’s]
Lump Sum Proposal.

 

          Exhibit C of the Contract provided the
“Construction Specifications.”  At
Specification LP-1, “General Conditions,” the Contract provides that, “Unless
otherwise specified, [El Paso] will furnish only basic reference lines and
bench marks from which [MasTec] shall establish such other points as it may
need.”  Specification LP-5, states, in
relevant part, that El Paso “will have exercised due diligence” in locating
foreign crossings and that MasTec “shall confirm” the location of the crossings
during construction before actually digging or drilling, as follows:

2.       COMPANY
FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in
locating foreign pipelines and utility line crossings.  However, the contractor shall confirm the
location of all such crossings and notify the owner prior to any ditching
activity in the vicinity of the crossings. . . .

 

          Specification LP-17
similarly provides, as follows:

          2.       FOREIGN LINE AND UTILITY CROSSINGS

The Company will have exercised due diligence in
locating foreign pipelines and/or utility line crossings.  However, the Contractor shall confirm the
location of all such crossings and notify the owner prior to any HDD[3] activity in the vicinity of the crossings.  Contractor shall be responsible for all
damages to foreign pipelines and/or utility line crossings during HDD
operations.  Contractor shall repair
damaged foreign pipelines and/or utility line crossings to original or better
condition and meet Company approval.  In
all cases, foreign pipelines, utility line crossings and/or structures take
precedence over Company tolerances. 

 

 

 

The Bid 

          White, on behalf of MasTec, submitted
a completed Contract, per El Paso’s bidding instructions, and a bid of
$3,619,960, which included the removal of the old pipeline and construction of
the new pipeline. White included a standard 15 percent contingency in the bid
for unidentified foreign crossings.

          After El Paso reviewed the bids
submitted by the various contractors and narrowed its choices to MasTec and one
other contractor, El Paso called a meeting with White.  According to White, he and El Paso went over
scheduling, manpower, equipment, and projected production rates to ensure
compliance with El Paso’s timeframe.[4] According to Ross, he and other representatives from
El Paso discussed with White that MasTec’s bid was substantially lower than the
bids submitted by other contractors and that MasTec would be permitted to
withdraw its bid if it so chose.  White disputes
that he was ever told that MasTec’s bid was low or that MasTec was being given
the choice to withdraw.  Ultimately, El
Paso accepted MasTec’s bid.

 

 

 

The
Contract is Executed and Work Begins

          Work on the Project was to commence
June 9, 2003 and to be completed on October 1, 2003.  Commencement was delayed because El Paso had
permitting issues and had not yet finalized the purchase of work space along
the right-of-way from some of the landowners. 
Nevertheless, work began in the early part of June. 

The
Dispute

          It is undisputed that, after
construction began, MasTec was required to confirm the exact locations of the
foreign crossings that El Paso had identified to avoid cutting through the
crossings.  MasTec began to encounter
numerous foreign pipeline crossings that were not on El Paso’s alignment
sheets.  MasTec hired Steve Edwards to
locate the foreign crossings.

          Edwards testified by deposition read
to the jury that foreign pipeline crossings represent a significant safety
hazard during pipeline construction. 
Each crossing must be treated as a “live” line, that is, “something that
is going to explode if you hit it.” 
Edwards employed a metal detector device, known as an “M-scope,” to find
the foreign crossings.  Edwards explained
that the M-scope is designed to locate metal pipelines, as well as PVC and
fiberglass pipelines that contain metal tracers.  The M-scope is not designed to locate
pipelines that do not contain metal or metal tracers.  To find PVC and fiberglass pipelines, Edwards
talked with adjacent landowners and pipeline operators; used a crew of up to 20
men to probe the ground with metal rods and shovels, and to dig trenches five
feet deep; used hydraulic vacuums to pressure wash the holes; and marked the
pipelines with stakes and red tape. 
Edwards said that he located an “extreme amount” of non-metal foreign
crossings and that MasTec was forced to hire an additional M-scope crew to keep
up with the pipeline strippers.   

          Edwards testified that it was not
unusual to find five to ten percent more foreign crossings than those
identified on the alignment sheets by the pipeline owner.  In this case, however, he found
“approximately 1000” foreign crossings that were not on El Paso’s alignment
sheets. Most of the unidentified foreign crossings were located on the O’Connor
Ranch.  Edwards said that El Paso had
refused to assist them in locating the lines.

          Greg Floerke, senior vice president of
MasTec’s Communications Group, explained that each time MasTec found a new
foreign crossing, it slowed production down and efficiency was lost.  MasTec had to stop the assembly line to
excavate, remove soil from around the crossing, lay the pipe, make special
bends, and weld each end.  Edwards
explained that, because of the close proximity of the other El Paso pipeline
and the Valero pipeline in the same right-of-way, each of these “tie-ins” that
were created to go around the foreign crossing required that special OSHA-approved
manholes be created so that a welder could safely go down and perform the
welds.  In addition, cutting crews and
X-ray crews had to go down in the holes. 
Further, there was a lot of sink water that had to be pumped out.

                   According
to Edwards, the situation was exacerbated by the fact that, during
construction, the area was hit with two hurricanes and 50 to 60 inches of rain
that flooded the area, filled the pipeline ditches with silt, and knocked out
all of Edwards’s stakes marking the previously unidentified plastic and
fiberglass crossings.  Edwards explained
that, had El Paso’s alignment sheets been accurate, the crews could have
followed the sheets, walked back to the crossings, and resumed work once the
weather stopped.  Instead, Edwards was
forced to re-survey and re-stake the foreign crossings in the right-of way.  Edwards said that the crews spent days
digging fruitlessly looking for lines.

          Ultimately, according to Edwards, it
was a representative from Valero who offered the most assistance.  El Paso had sold a 12-inch pipeline in the
same corridor to Valero that ran parallel to the pipeline at issue in the
instant suit.  Edwards testified that
Valero’s alignment sheets contained many of the plastic and fiberglass
crossings that he was finding.  

          According to Edwards, of those foreign
crossings that Gullett had staked, several were mis-marked, were 20 to 30 feet
off their exact locations, and had to be relocated.  Edwards testified that, ultimately, Gullett
came out to the site and followed behind Edwards, recording the foreign
pipeline crossings that Edwards and his crews had located.  

          Greg Perkins, a mechanical engineer
testifying as an expert for MasTec, said that he found quite a disparity
between El Paso’s for-bid drawings and the as-built drawings.  Perkins said that the Contract required El
Paso to use due diligence in locating the foreign crossings; that MasTec
depended on El Paso’s statement of the foreign crossings; and that the level of
El Paso’s inaccuracy “was catastrophic.” 
With all of the other pipelines in the same route as the subject
pipeline, El Paso “should have had a better handle on the number of foreign
crossings that were actually there.” 
Perkins explained that El Paso could have contacted landowners and
operating companies.  Perkins testified
that MasTec located 794 foreign crossings and that over 200 of those crossings
were actually metal pipelines that had not been identified on El Paso’s
alignment sheets. 

          John Reitzell, assistant project
manager for MasTec, took over the Project after White was let go on November
19, 2003.  Reitzell testified that the
crews were having to pressure wash to find the lines and that Valero’s drawings
of the foreign crossings over its parallel pipeline were much more accurate and
included the plastic lines.  According to
Reitzell, it took a crew about 10 hours to perform a single tie-in.  Reitzell testified that MasTec could have
accepted a variance of five percent on the foreign crossings, but that there
were three times as many foreign crossings as indicated on El Paso’s alignment
sheets.  In addition, Reitzell explained
that the “take up” crew that worked to pull up the old pipeline found it
located at depths of six to seven feet underground.  According to Reitzell, El Paso had told
MasTec that the pipeline was buried no more than 12 inches in the ground.  

          With regard to the duties under the
Contract, Floerke testified that the Contract placed the responsibility on El
Paso to apply due diligence in locating and correctly identifying foreign
crossings and that MasTec’s responsibility was to verify those crossings before
digging.  Floerke testified that the issue
is timing.  First, El Paso’s duty to use
due diligence in determining the extent and location of foreign pipelines
arose.  Then, after the bid was awarded,
the contract was complete, and the crews were out in the field constructing the
line, MasTec’s duty arose to verify the foreign crossings before actual
excavation.

          Danny Dial, a forensic engineer
testifying for MasTec, explained that “due diligence,” in the present context,
means that the operating company is telling the pipeline contractor that they
have been diligent in locating all the foreign crossings and will provide the
information to the contractor.  Dial
testified that the industry custom or practice is that, before soliciting bids
for pipeline construction, operating companies (1) gather any “one-call”[5] information in their catalog; (2)
send out a survey crew; and (3) send their landmen to talk with the landowners
from whom the company obtained its right-of-way easements because the
landowners are the best source of information regarding any other easements
that have been granted to other pipeline operators in the same area.

          Dial explained that, because there was
an existing Valero pipeline in the same right-of-way[6] and parallel to the subject
pipeline, “it would have been prudent for El Paso to contact Valero and compare
as-built drawings to see if they were aware of other foreign crossings in that
area.” 

          Dial explained that when a lump-sum
agreement is made between an operating company and a contractor, the contractor
is necessarily placing a tremendous amount of trust in the specifications that
the operating company submits to the contractor for the bid.  The contractor cannot see what is physically
underground and has to rely on information given by the operator. Here, El Paso
specifically placed in the Contract assurances that it had exercised due
diligence in locating any foreign crossings. 
El Paso owns the line, controls the easement, and has access to what
crosses through the area.  

          Ross, of El Paso, testified that El
Paso hired the survey company, Gullett & Associates, to survey the line, to
use metal detectors, and to “try to locate any pipeline that they can, anything
visible,” such as line markers.  Ross
testified that El Paso had the preliminary alignment sheets that were created
in the 1940s for the pipeline at issue, but that he could not recall having
seen any as-built alignment sheets.  Ross
testified that the alignment sheets came from the operating company, Coastal,
from whom El Paso had purchased the pipeline, that the sheets “were very poor,”
“very inadequate,” and would not have shown any of the crossings that were
installed after the 1940s.  Ross said
that he did not believe that the alignment sheets were ever updated.  When asked if he had seen the alignment
sheets for Valero’s line, Ross replied that he did not recall having had access
to them.  Ross testified that he did not
instruct Gullett to attempt to locate or mark any PVC or fiberglass lines
unless such lines could be seen “by something visual.”  Ross further stated that he did not inquire whether
El Paso had any “one call” information cataloged and did not attempt to contact
any of the landowners or other operating companies along the pipeline
route.  Ross asserted that El Paso “was
to perform due diligence to the best they were available [sic] and that’s what
[it] did.”

          Richard Schubert, survey supervisor
for Gullett, testified that his scope of work on the Project was to “collect
all data that was pertinent to mapping the pipeline, whether above ground facilities,
an oil well, . . . a below ground structure, a pipeline.”  Schubert testified that he was asked to
locate all the foreign crossings that he could locate “strictly with the
M-scope.”  Schubert testified that he did
not attempt to find any PVC or fiberglass lines because it was not part of El
Paso’s instructions.  At the close of the
Project, El Paso sent Schubert back out to confirm the number and locations of
the additional foreign crossings that MasTec had reported to El Paso.  Schubert testified that he recorded the GPS
location of each foreign crossing. 
Schubert stated that he also recorded every tie-in because each of the
welds must be reported to the Texas Department of Transportation.  Schubert testified that there were 274
additional foreign crossings and 126 additional tie-ins.  During Schubert’s testimony, it was discussed
that the alignment sheets Gullett prepared for El Paso to give to the
contractors for bidding purposes showed 282 foreign crossings and the as-built
drawings Gullett prepared after MasTec completed the Project showed 343
additional foreign crossings—208 of which were metal.

          According to Mastec, there were 794
foreign crossings, which required a total of 217 additional tie-ins.  The Project was complete in December 2003. 

Communications
Concerning the Foreign Crossings 

          During construction, in a letter to
White from Mark Bounds, Director of Onshore Engineering for El Paso Field
Services, dated September 5, 2003, Bounds wrote to confirm that the Project was
on track for completion by October 1, 2003, and to confirm that “as of
September 1, 2003, there were [sic] no outstanding extra work issues or claims
for additional compensation that had not been addressed by EPFS [El Paso Field
Services] to MasTec’s full satisfaction” and to confirm that “all extra work
performed prior to September 1, 2003 has been addressed to MasTec’s full
satisfaction and included in payments to Contractor authorized to date.”  

          White responded to Bounds, in a letter
dated September 8, 2003, 

I would like to take this opportunity to bring to your
attention some issues that I feel justify discussion for extra compensation to
MasTec for costs not covered by the Contract. 
This letter does not represent any demand by MasTec for payment for
extra cost issues at this time.  We
merely are asking that you take into consideration and review our position
related to additional costs beyond our control.

          . . . . 

Please review the following issues that I feel should
be entitled to some compensation, for our cost overrun.  Keep in mind that MasTec does not feel
that EPFS misrepresented any information intentionally, or withheld any
information pertinent to bidding this project. 
We merely feel that circumstances, beyond your control, and ours, has
had a cost impact to MasTec worth reviewing.

          . . . .

          2)      Pipeline
Crossing (Foreign Pipelines) O’Connor Ranch

From [point-to-point] there are approximately 87
pipeline crossings, indicated on the line sheets.  During the bidding process, we allowed for a
15% increase in the estimated line crossings to arrive at a cost amount.  The final outcome is there are approximately
450-500 pipeline crossings in this area. 
(We will have documentation with accurate numbers in a few days.)  These were mostly all fiberglass lines that
no one had any knowledge of.  There is a
great deal of extra cost associated with ditching and tie-ins . . . . 

 

          White testified by deposition at trial
that he had not submitted change orders on the additional foreign pipeline
crossings because the “problems were still ongoing and we couldn’t arrive at a
cost” yet.  White testified that he had
had daily conversations with El Paso because El Paso was concerned, with all of
the flooding about the penalties El Paso faced with a third party if the completion
deadline was not met. 

          In a letter to White from Bounds,
dated September 26, 2003, Bounds responded that it was El Paso’s position that
the issues White stated were within MasTec’s scope of work.  Specifically, with regard to the foreign crossings,
Bounds stated, 

The fact was well documented that in the project
alignment sheets provided to MasTec that [El Paso’s] 8-inch Butane Shuttle pipe
replacement project was to traverse numerous active and inactive oil and gas
producing fields along its entire length. 
Also, [the specifications] state that [El Paso] will exercise due
diligence in locating foreign pipeline crossings but it is [MasTec’s]
responsibility to confirm all such crossings and contact the owner therof prior
to any excavation.  In effect, [El Paso]
contracted with [MasTec] to provide this service as part of the pipeline
replacement Work and is therefore included in [MasTec’s] project Scope of Work
as defined in the bid documents. [MasTec’s] execution of the construction
agreement represented that [MasTec] had fully acquainted itself with the site,
including without limitation, the general topography, . . . subsurface
conditions, obstructions, and all other conditions pertaining to the Work and
made all investigations essential to a full understanding of the difficulties
which may be encountered in performing the Work, and that anything in the
contract or in any representations, statements or information made or furnished
by [El Paso] or any of it [sic] representatives notwithstanding, [MasTec]
assumed full and complete responsibility for any such conditions pertaining to
the Work or its surroundings and all risks in connection therewith.

 

          In a second letter of the same date,
Bounds asked White to indicate by signing that all of the change orders, which
had been submitted prior to September 1, had been agreed upon.  White signed the letter.  White testified that there were no
outstanding change orders on the foreign crossings because the rains were
ongoing, resolution of the foreign pipeline issues was ongoing, and MasTec was
completely unable to assign a cost.  The
testimony at trial was that, in a check dated on or about this same date, El
Paso paid MasTec $48,000 for additional drilling costs associated with the
unidentified foreign crossings. 

The
Lawsuit

          MasTec sued El Paso for breach of
contract and fraud,[7] alleging that El Paso had, during the bidding process,
provided MasTec with drawings, specifications, and other materials so that
MasTec could evaluate the work and prepare a bid, and that MasTec relied on
that information; that El Paso had represented that its existing pipeline was
either on top of the ground or buried no more than 12 inches below the ground,
but that MasTec had discovered during deconstruction that the majority of the
existing pipeline was buried two to five feet below ground level; that the
Contract required El Paso to employ due diligence in identifying or marking all
foreign crossings, that El Paso had failed to do so, and that El Paso had
misrepresented the true number of foreign crossings by 500 percent; that El
Paso’s employees or agents made promises to surface landowners with respect to
services and improvements that went beyond the scope of the Contract and the
bid; and that El Paso had refused to issue change orders or to compensate
MasTec for any of the additional work. 
In the alternative, MasTec sought to recover under theories of quantum
meruit and quantum valebant.  MasTec
sought $5.3 million in damages. 

          The matter was tried to a jury.  The jury was asked in Question One of the
charge whether El Paso had failed to comply with the contract, and the jury was
instructed that it “should consider whether El Paso exercised due diligence in
locating foreign pipelines and/or utility line crossings.”  The jury answered, “Yes.”  In Question Three, the jury was asked what
sum of money would “fairly and reasonably compensate MasTec for its damages, if
any, that resulted from El Paso’s failure to comply with the contract.”  The jury was instructed to consider any
increased costs incurred by MasTec as a result of unidentified foreign
crossings and any consequential lost profits. 
The jury answered, “$4,763,890.” 
Further, the jury found that MasTec failed to comply with the contract
by failing to complete the work required and awarded El Paso $104,687.09 in
damages.[8]    

          Subsequently, El Paso moved to
disregard the jury’s findings and for judgment notwithstanding the verdict.  El Paso asserted that Question One of the
jury charge was improperly worded and that “MasTec’s own contractual
representations and commitments conclusively preclude any recovery in its favor
based on this finding.”  Specifically, El
Paso complained, 

Question No. 1 is framed as a breach of contract
question and focused on whether [El Paso] had exercised due diligence in
locating foreign pipeline and utility line crossings. [El Paso’s] efforts to
locate these crossings, however, came before the construction contract
and the representation regarding the crossings were contained only in
the plans and specifications for the project. 
Therefore, the contractual provision regarding [El Paso’s] “due
diligence” did not involve any future performance but at best constituted a
warranty.

 

El Paso
contended that MasTec’s “Breach of Warranty” claim was precluded under
paragraph 8.1(a)(7) of the Contract, under which MasTec was precluded from
relying on “any warranty” by El Paso regarding due diligence in locating the
foreign pipelines and utility crossings and that MasTec had assumed the
associated risks.

          El Paso asserted that “[t]he fact that
MasTec encountered more underground pipeline crossings than were shown on the
drawings was a risk it willingly and openly assumed” and MasTec “has no breach
of contract action against [El Paso] on this basis.” 

          The trial court agreed.  The trial court found, in pertinent part, as
follows: 

El Paso Field Services, L.P.[,] moved for judgment on
the ground that no jury issue was submitted against it, and the Court is of the
opinion that El Paso Field Services, L.P.[,] is entitled to judgment.  Therefore, it is ORDERED, ADJUDGED, and
DECREED that [MasTec] take nothing against El Paso Field Services, L.P.[9]

 

[MasTec] filed a motion for entry of judgment on the
jury verdict. [El Paso South[10]] filed a motion for entry of judgment . . . the Court finds that the
Contract at issue in this case between [MasTec] and [El Paso] (admitted into
evidence as Defendants’ Exhibit 1) is clear and unambiguous.  This Contract allocates the risk of any
additional cost incurred because of foreign pipeline crossings to
[MasTec].  The Court therefore grants [El
Paso’s] motion (a) for judgment non obstante verdicto and (b) to disregard
certain jury answers.  The jury’s answers
to Questions 1 and 3 in the court’s charge are immaterial and are
disregarded.  It is accordingly ORDERED,
ADJUDGED, and DECREED that [MasTec] take nothing against [El Paso] on its claim
for additional compensation under the Contract. 
Because of this ruling, MasTec is not entitled to recover any of its
attorneys’ fees incurred in the prosecution of its breach of contract claim
against [El Paso].

 

          MasTec moved to “vacate, modify,
correct, or reform” the judgment and, alternatively, for a new trial.  The trial court denied MasTec’s motion.  This appeal ensued.

Judgment Notwithstanding the Verdict

          In its sole issue, MasTec contends
that the trial court erred by granting JNOV in favor of El Paso. 

          The jury found that El Paso failed to
exercise the due diligence it promised in the Contract with regard to locating
underground foreign pipelines.  El Paso
moved for JNOV on the ground that the jury’s finding was immaterial because
“Mastec’s own contractual representations and commitments conclusively preclude
any recovery based on this finding.”  The
trial court agreed, holding that the Contract allocates the risk of any
additional cost incurred because of foreign pipeline crossings to MasTec. On
appeal, MasTec contends that the trial court’s interpretation of the Contract
rendered the due diligence provision a nullity and improperly shifted all the
risks associated with those crossings to MasTec. We consider whether the
Contract conclusively precludes recovery.

 

A.      Standard
of Review

          A trial court may disregard a jury
finding and enter a judgment notwithstanding the verdict (“JNOV”) if the
finding is immaterial or if there is no evidence to support one or more of the
jury findings on issues necessary to liability. 
See Tex. R. Civ. P. 301; Tiller
v. McClure, 121 S.W.3d 709, 713 (Tex. 2003); Spencer v. Eagle Star Ins.
Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994); Williams v. Briscoe,
137 S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.).   A question is “immaterial” when it should
not have been submitted to the jury, it calls for a finding beyond the province
of the jury, such as a question of law, or when it was properly submitted but
has been rendered immaterial by other findings. 
Se. Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999); Spencer,
876 S.W.2d at 157.

          When, as here, a trial court specifies
the ground upon which it grants a JNOV, an appellant need only challenge the
ground relied upon by the trial court.  Voskamp v. Arnoldy, 749 S.W.2d 113, 118
(Tex. App.—Houston [1st Dist.] 1987, writ denied).  However, the appellee may assert on appeal
the grounds that it alleged in its motion for JNOV, but that were not relied
upon by the trial court, to attempt to vitiate the jury’s verdict. Tex. R. App. P. 38.2(b); Tex. R. Civ. P. 324(c); Voskamp,
749 S.W.2d at 118.

B.      Governing
Principles of Law

          In construing a written contract, the
primary concern is to ascertain and give effect to the parties’ intentions as
expressed in the document.  Frost
Nat’l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 311–12 (Tex.
2005).  We consider the entire writing
and attempt to harmonize and give effect to all the provisions of the contract
by analyzing the provisions with reference to the whole agreement. Id.
at 312. We presume that the parties intended for every clause to have some
effect.  Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). No single provision is
given controlling effect. J.M. Davidson, Inc. v. Webster, 128 S.W.3d
223, 229 (Tex. 2003).  We give terms
their plain, ordinary and generally accepted meaning unless the instrument
shows that the parties used them in a technical or different sense. NationsBank,
939 S.W.2d at 121.  We construe contracts
“from a utilitarian standpoint bearing in mind the particular business activity
sought to be served,” and “will avoid when possible and proper a construction
which is unreasonable, inequitable, and oppressive.” Frost Nat’l Bank,
165 S.W.3d at 312 (quoting Reilly v. Rangers Mgmt., Inc., 727
S.W.2d 527, 530 (Tex. 1987)).








          If, after the pertinent rules of
construction are applied, the contract can be given a definite or certain legal
meaning, it is unambiguous, and we construe it as a matter of law. Id.; Transcon.
Gas Pipeline Corp. v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.—Houston
[1st Dist.] 2000, pet. denied) (holding that “[i]f the contract is unambiguous,
the court must enforce the contract as written”).   However, if the meaning of the contract
remains uncertain or is susceptible to more than one reasonable interpretation,
it is ambiguous. Nat’l Union Fire Ins. Co. v. CBI Indus., Inc., 907
S.W.2d 517, 520 (Tex. 1995); Coker, 650 S.W.2d at 393–94.    

          Whether a contract is ambiguous is a
question of law to be determined “by looking at the contract as a whole in
light of the circumstances present when the contract was entered.” Coker,
650 S.W.2d at 394.  Only when a contract
is first determined to be ambiguous may the courts consider the parties’
interpretation and admit extraneous evidence to determine the true meaning of
the instrument. Nat’l Union Fire Ins. Co., 907 S.W.2d at 520.  An ambiguity does not arise simply because
the parties advance conflicting interpretations of the contract.  Forbau v. Aetna Life Ins. Co., 876 S.W.2d
132, 134 (Tex. 1994).  A court may conclude
that a contract is ambiguous even in the absence of such a pleading by either
party. Sage St. Assocs. v. Northdale Constr. Co., 863 S.W.2d 438, 445
(Tex. 1993).

C.      The Applicable Contract Provisions

          MasTec directs us to Specifications
LP-5 and LP-17 of the Contract, which it contends specifically address foreign
crossings and provide that El Paso “will have exercised due diligence in
locating” the crossings, as follows:

          2.       COMPANY FOREIGN LINE AND UTILITY CROSSINGS

[El Paso] will have exercised due diligence in locating foreign pipelines and utility line
crossings.  However, the
contractor shall confirm the location of all such crossings and notify
the owner prior to any ditching activity in the vicinity of the crossings. . .
.

          . . . .

          2.       FOREIGN LINE AND UTILITY CROSSINGS

[El Paso] will have exercised due diligence in
locating foreign pipelines and/or utility line crossings.  However, the Contractor shall confirm the
location of all such crossings and notify the owner prior to any HDD activity
in the vicinity of the crossings. 
Contractor shall be responsible for all damages to foreign pipelines
and/or utility line crossings during HDD operations.  Contractor shall repair damaged foreign
pipelines and/or utility line crossings to original or better condition and
meet Company approval.  In all cases,
foreign pipelines, utility line crossings and/or structures take precedence
over Company tolerances. 

 

Specifications
LP-5, -17 (emphasis added).

          The plain language of Specifications
LP-5 and LP-17 reflects that El Paso made affirmative assurances that it had
exercised “due diligence” in locating foreign crossings.  The provision further expresses that the
parties intended that MasTec “confirm the location of all such
crossings” prior to actually ditching in the vicinity of those crossings and
that MasTec notify each foreign crossing owner prior to digging in the vicinity
of their crossing. (Emphasis added.)  

          We do not find any place within the
four corners of the Contract that the term “due diligence” is defined.  When a contract term is not defined, it will
be given its plain, ordinary, and generally accepted meaning,  DeWitt County Elec. Co-op., Inc. v. Parks,
1 S.W.3d 96, 101 (Tex. 1999),  unless the
instrument shows that the parties used it in a technical or different sense. NationsBank,
939 S.W.2d at 121.  The Texas Supreme
Court has held, “The term ‘diligence’ is relative and incapable of exact
definition. Its meaning must be determined by the circumstances of each
case.  Reasonable diligence has been
defined as such diligence that an ordinarily prudent and diligent person would
exercise under similar circumstances. . . . It is usually a question of fact.”  Strickland v. Lake, 163 Tex. 445, 448,
357 S.W.2d 383, 384 (Tex. 1962); see Wheeler v. Methodist Hosp., 95
S.W.3d 628, 637 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (stating that
whether party has exercised “due diligence” is question of fact).  

          Here, El Paso’s assurances that due
diligence will have been exercised in locating foreign crossings is reasonably
construed as meaning that the steps that an ordinarily prudent and diligent
person would exercise under similar circumstances will have been
performed.  What those steps entail and
whether they were performed in this case is a question of fact.  See Strickland, 163 Tex. At 448, 357
S.W.2d at 384; Wheeler, 95 S.W.3d at 637; see also Oxoco Exploration
& Prod. Co. v. Arrowhead Drilling Corp., No. A14-86-181-CV, 1986 WL
11603, at *2 (Tex. App.—Houston [14th Dist.] Oct. 16, 1986, no pet.) (mem. op.)
(holding that whether due diligence was exercised in drilling contract was fact
issue for jury to resolve under circumstances presented).

          Here, the jury found that El Paso
failed to “exercise[] due diligence in locating foreign pipelines and/or
utility line crossings.”  El Paso moved
for JNOV on the grounds that “[t]he fact that MasTec encountered more
underground pipeline crossings than were shown on the drawings was a risk it
willingly and openly assumed” under the Contract.  El Paso directs us to Articles 2.1, 7.1(e),
8.1(a)(7), and to Exhibit B-1.

          Article 2.1 states, in relevant part,
as follows:

[MasTec] agrees, at its cost, that it shall (except as
otherwise provided for in the Contract or Drawings) furnish all necessary
materials, supplies, labor, tools, equipment superintendence, apparatus and
machinery, including without limitation, transportation and all other items
necessary to perform the Work for the construction and completion . . . .

 

          The plain language of this provision
reflects that MasTec promised to furnish, at its cost, the items necessary to
perform the work, “except as otherwise provided for in the Contract or
Drawings.”  Hence, MasTec’s obligation to
perform the work for a lump sum is subject to exceptions.

          Articles 7.1(e) and 8.1(a)(7) are similar.  Article 7.1(e) provides that

 

[MasTec represents] [t]hat its duly authorized
representative has visited the site of the Work, is familiar with the local and
special conditions under which the Work is to be performed and has correlated
the on site observations with the requirements of the Contract and has fully
acquainted itself with the site, including without limitation, the general
topography, accessibility, soil structure, subsurface conditions, obstructions
and all other conditions pertaining to the Work and has made all investigations
essential to a full understanding of the difficulties which may be encountered
in performing the Work, and that anything in this Contract or in any representations,
statements or information made or furnished by [El Paso] or any of its
representatives notwithstanding, [MasTec] assumes full and complete
responsibility for any such conditions pertaining to the Work, the site of the
Work or its surroundings and all risks in connection therewith . . . .

 

          Article 8.1(a)(7) provides that 

[MasTec] represents that it has had an opportunity to
examine, and has carefully examined, all of the Contract documents and has
fully acquainted itself with the Scope of Work, design, availability of
materials, existing facilities, the general topography, soil structure,
substructure conditions, obstructions, and all other conditions pertaining to
the Work, the site of the Work and its surroundings; that it has made all
investigations essential to a full understanding of the difficulties which may
be encountered in performing the Work; and that anything in any of the Contract
documents or in any representations, statements or information made or
furnished by [El Paso] or its representatives notwithstanding, [Mastec] will
regardless of any such conditions pertaining to the Work, the site of the Work
or its surroundings, complete the Work for the compensation stated in this
Contract, and pursuant to the extent of [MasTec’s] liability under this
Contract, assume full and complete responsibility for any such conditions
pertaining to the Work, the site of the Work or its surroundings, and all risks
in connection therewith.  In addition
thereto, [MasTec] represents that it is fully qualified to do the work in
accordance with the terms of this Contract within the time specified.

 

          Articles 7.1(e) and 8.1(a)(7) each
provide that MasTec represented that it was “familiar with” or had “fully
acquainted itself with” the work and the site. 
The meaning of the language “is familiar with” and “has fully acquainted
itself with,” as used in the Contract, is not immediately clear.  The 
plain, ordinary, and generally accepted meaning of the terms “familiar”
and “acquainted,” however, reflects an intent that a representative of MasTec
develop at least some  personal knowledge
of the work and of the site.  See
Parks, 1 S.W.3d at 101 (stating that terms not defined in contract are
given plain, ordinary, and generally accepted meaning).  With regard to underground foreign crossings,
nothing in this language suggests that the parties intended that MasTec, at the
time of contracting, have actually ascertained on its own the number and
location of underground foreign crossings along El Paso’s 68-mile pipeline corridor.  

          By contrast, other language in article
8.1(a)(7) specifies that MasTec was to have “carefully examined” all of the
Contract documents.  The clear intent
expressed by this language is that the parties intended to place strong
emphasis on that which was contained in “all of the Contract documents.” The
Contract documents include alignment sheets created by a professional
engineering firm, purporting to reflect the number and location of underground
foreign crossings, along with express written assurances by El Paso that due
diligence was exercised in developing the Specifications it gave to MasTec
regarding the number and location of underground foreign crossings.

 

          Both articles 7.1(e) and 8.1(a)(7)
provide that MasTec was to have conducted “all investigations essential to a
full understanding” of the work.  The
intent reasonably deduced from this language, when read in light of El Paso’s
assurances at LP-5 and LP-17 regarding foreign crossings and the professional
drawings, is that MasTec was to conduct any remaining investigations that it
deemed necessary with regard to formulating its overall understanding of the
work.  It is not reasonable to conclude
that the parties intended that an “essential” investigation include a highly
impractical, complete re-investigation of the Specifications El Paso had
already provided regarding 68 miles of its own existing underground pipeline
and corridor.  See Frost Nat’l Bank,
165 S.W.3d at 312 (stating that “[w]e construe contracts from a utilitarian
standpoint, bearing in mind the particular business activity,” and avoid
unreasonable constructions); see also Hollerbach v. United States, 233
U.S. 165, 172, 34 S. Ct. 553, 556 (1914) (stating that owner’s specifications
regarding character of underground material was matter upon which owner might
be presumed to speak with knowledge and authority, and concluding that
contractor was not required to undertake investigation to prove falsity of
owner’s specifications).  Moreover, it is
reasonable to conclude that El Paso’s assurances would effectively thwart an
in-depth re-investigation by MasTec.

 

          This conclusion is supported by other
language in Article 7.1(e), which states that MasTec was simply to have
“correlated” its “on site observations” with the Contract.  (Emphasis added.)  The clear intent expressed by this language
is that MasTec was to observe the site—that is, to view it by sight—and to
compare what it saw with what was provided in the Contract. 

          Although articles 7.1(e) and 8.1(a)(7)
include the terms “substructure conditions” and “obstructions,” these
provisions do not expressly include underground foreign crossings.  By contrast, LP-5 and LP-17, discussed above,
contain specific assurances concerning “foreign crossings.”

Turning to Exhibit B-1, “Contractor’s Proposal,” paragraph 1 provides
that MasTec agreed to

         [f]urnish
all labor, equipment and materials as described in the Specifications for all
Work necessary to perform the following applicable Work as shown on the
Drawings, including but not limited to: loading, hauling, unloading, storing,
clearing, excavating, including rock if encountered, cutting and beveling of
pipe; installing pipe or valves, where required; removing pipe or valves, where
required; welding (including tie-in and transition welds, if required);
coating, repairing coating, furnishing and installing padding when applicable;
installing concrete supports; blow-offs, bypasses, bolting, bracing hydrostatic
testing of completed assemblies, painting of newly installed piping assemblies and
cleanup.

 








          The plain language of this paragraph
reflects that MasTec’s promise to furnish all labor, equipment and materials,
specifically with regard to tie-ins, applies to that which is “described in the
Specifications” and “shown on the Drawings.” 

          Exhibit B-1 at paragraph 15 provides
that

[a]ny Work required to complete installation of the
new pipeline but not shown as a pay item is no less included in the scope of
work for installation of the new 8-inch Butane Shuttle pipeline and is included
in [MasTec’s] lump sum proposal.  Just
because an item of Work is not specifically identified, does not mean such Work
is not included in [MasTec’s] scope of Work. 
Any item of Work [MasTec] knows is required for completion of the
installation but not specifically identified is to be included in [MasTec’s] Lump
Sum Proposal.

 

          This paragraph reflects that any item
not shown as a pay item “is included in the lump sum proposal,” but it is
qualified by “[a]ny item of Work [MasTec] knows is required for
completion. . . .” (Emphasis added.)  

          So far, articles 2.1, 7.1(e),
8.1(a)(7) and Exhibit B-1, read together and in light of the entire Contract,
evidence an intent that MasTec’s responsibilities under the Contract with
regard to unidentified foreign crossings were to be subject to El Paso’s
Specifications, Drawings, and assurances under the Contract. 

          However, articles 7.1(e) and 8.1(a)(7)
also provide that, “notwithstanding” any information in the Contract or
statements made by El Paso, MasTec “assumes full and complete responsibility”
for the site conditions and the associated “risks,” and will “complete the work
for the lump sum stated in the Contract.” 
This language suggests an attempt by El Paso to disavow its assurances
of due diligence at LP-5 and LP-17 and its qualifying language in articles 2.1,
7.1(e), 8.1(a)(7) and Exhibit B-1.  No
single provision is given such controlling effect.  See Webster, 128 S.W.3d at 229.   

          In addition, construing the
“notwithstanding” language to require MasTec to disbelieve El Paso’s
Specifications regarding the number and location of underground crossings, to
ignore El Paso’s assurances under the Contract that it exercised due diligence
in developing its Specifications, and to independently determine, at the time
of contracting, El Paso’s degree of error along 68 miles of El Paso’s own
existing underground pipeline is, we think, an unreasonable construction.  Again, we construe contracts “from a
utilitarian standpoint bearing in mind the particular business activity sought
to be served,” and “will avoid when possible and proper a construction which is
unreasonable, inequitable, and oppressive.” 
Frost Nat’l Bank, 165 S.W.3d at 312.

          El Paso contends that the caselaw
supports construing the “notwithstanding” language in light of the
pre-bid-investigation and lump sum provisions of the Contract as placing the
risk of differing or unexpected site conditions on MasTec as a matter of
law.  To the contrary, MasTec contends
that the caselaw supports that it is not, by the inclusion of such language,
precluded from recovery as a matter of law.

 

 

D.      The
Risk of Differing or Unexpected Site Conditions

          MasTec directs us to Shintech Inc.
v. Group Constructors, Inc., 688 S.W.2d 144, (Tex. App.—Houston [14th
Dist.] 1985, no writ), and IT Corporation v. Motco Site Trust Fund, 903
F.Supp. 1106 (S.D. Tex. 1994).

          In Shintech, the court allowed
a contractor to recover for damages in spite of a site inspection clause and
the contractor’s assumption of risk under the contract.  Shintech Inc., 688 S.W.2d at 151.  There, owner Shintech engaged a contractor,
Group, to finish an industrial plant expansion. Id. at 147.  Group submitted a lump sum bid to “furnish
all labor, construction services, and supplies necessary,” which was
accepted.  Id.

          During the project, Shintech allegedly
interfered with the efficiency of Group’s work. 
Group sued Shintech, asserting, inter alia, that Group incurred expenses
based on Shintech’s “excessive design errors, changes, and extra work
orders.”  Id. at 147–48 (emphasis
added).  The trial court rendered judgment
in favor of Group.  Id. at 148.

          On appeal, the court recognized that a
contractor is entitled to recover from an owner for losses due to delay and
hindrance of its work if it proves (1) that its work was delayed or hindered,
(2) that it suffered damages, and (3) that the owner was responsible for the
act or omission that caused the delay or hindrance.  Id.  Shintech complained that, in the contract,
Group had assumed the risk of delays and hindrances as follows: “Having fully
acquainted itself with the work, the site of the work, its surroundings and all
risk in connection therewith, the contractor assumes full and complete
responsibility for completing the work for the compensation and within the time
provided . . . .” Id. at 151 (emphasis omitted).  The court rejected Shintech’s theory, stating
that it found no evidence that Group had knowledge of defective specifications
prior to beginning its work.  Id.  In addition, the court found that the Shintech
contract also provided, “Upsets of [the construction schedule] caused by
acts of the client [Shintech] or those over which he controls causing undue
expense on the contractor [Group] shall be for the owner’s [Shintech’s]
account.”  Id. at 148 (emphasis
omitted). 

          Here, like the contractor in Shintech,
MasTec agreed to supply all services, labor, and materials necessary under a
lump sum contract; MasTec agreed to inspect the site and to assume
responsibility for timely completing the work for the agreed compensation;
MasTec later discovered excessive errors in the specifications provided by El
Paso; and MasTec did not have knowledge of the defective specifications prior
to beginning its work. Also, the Contract herein provides at Article 4.6,
“COMPENSATION FOR DELAYS IN PERFORMANCE OF WORK,” section b, “For delays in the
performance of the Work attributable to [El Paso], it is agreed that the
compensation and/or amounts due [MasTec] in full and complete settlement of
such delays shall be as follows: [various lump sum settlement or reimbursement
options].”   Hence, there is some
evidence in the Contract of intent to allocate to El Paso those expenses that
cause MasTec delay and that are attributable to El Paso.

          MasTec also directs us to IT
Corporation, a case from the southern district of Texas.  903 F.Supp. at 1106. There, the Environmental
Protection Agency required Monsanto to perform remedial action at Monsanto’s
hazardous waste site.  Id. at
1111.  Monsanto sent to contractors a
request for proposal and scope of work (“bid documents”) that included technical
data concerning the chemical waste at the site, as prepared by Monsanto’s
consultants.  Id.  A letter accompanying the bid documents
stated that the waste characteristics were “for information only and will not
establish the basis for qualifying bids, quantities, methods, compositions,
etc. We feel that sufficient information is available to allow a responsible,
experienced contractor to provide a lump sum bid for the service required. . .
.”  Id. at 1117.  The bid documents specified that on-site incineration
was to be the primary remedial method employed.  Id. at 1111.

          Although the letter accompanying the
bid documents stated that the waste characteristics given were for information
only, the proposed bid format stated that the information shown in the
specifications “shall be used” in 
determining the lump sum price; that the “data is based upon test
results by an independent consultant and is considered reliable”; that the
contractor should include a “suitable contingency based upon the contractor’s
experience”; and that “no cost adjustments will be allowed for surface debris
quantities different from those noted.”  Id.
at 1117–18.

          Contractor ITC visited the site,
obtained waste samples, performed limited testing, and submitted its lump-sum
bid with a signed statement that it was familiar with the site.  Id. at 1111.  ITC was awarded the contract.  Id.

          The contract defined the scope of work
as follows:

The “Work” to be performed by Contractor under this
Agreement shall consist of furnishing all personnel, supervision, services,
field labor, materials, tools, equipment, supplies and all things required for
the necessary design, engineering, construction of facilities and all
associated services to properly complete the Remedial Action in strict accordance
with the Project Scope of Work . . . .

Contractor shall provide all labor, material,
equipment and supervision required to complete the remediation . . . .

 

Id. at 1119. The Scope of Work section in the bid documents and the contract
included extensive tables and maps describing the geologic and hydrologic
characteristics of the site.  Id.         

 

          During the work, ITC discovered that
the waste characteristics were not as Monsanto had specified in the bid
documents. Id. at 1111–12.  ITC
notified Monsanto that ITC could not reasonably have discovered the errors
until ITC had performed extensive work at the site and that these differences
had a drastic impact on efficiency of incineration and costs.  Id. at 1112.   ITC claimed that it could not do the work
for the price it bid because the work was not as represented by Monsanto.   Id.  Monsanto refused to consider ITC’s claims
until ITC completed a “trial burn.” Id. 
ITC continued to work under the contract while the parties
negotiated.  The parties were unable to
find compromise, and ITC suspended its work. 
Id.

          ITC sued Monsanto for, inter alia,
breach of contract, alleging that ITC had been forced to discontinue work
because Monsanto had misrepresented the site conditions.  The jury returned a verdict in favor of
ITC.  Id.

          On appeal, Monsanto contended that any
misrepresentation in the bid documents was not a breach of the contract.  Id. at 1115.  The court disagreed, holding that Monsanto
had made assertions concerning the characteristics of the waste that were
materially false and that ITC, although it had not investigated the accuracies
of the characteristics described in the bid documents, was not estopped from
asserting a breach of contract claim.  Id.
at 1115–16.

          In addition, Monsanto argued that the
contract placed the risk of the site conditions on ITC, that ITC had assumed
the risk by verifying with its bid that it was familiar with the site
conditions, and that ITC was estopped by its investigation from complaining
about any misrepresentations in the RFP. 
Id. at 1116.  Monsanto
further argued that, as a matter of law, the contract placed the risk of
differing or unexpected site conditions on the contractor, required the contractor
to investigate the site prior to bidding, and that the contractor directed his
own work under the contract.  Id. 

          ITC did not dispute that it was
required to perform the contract for a lump sum.  Id. 
at 1117.  ITC asserted,
however, that the contract did not require it to bear the risk that the bid
documents misrepresented the nature and amount of the work to be
performed.  Id.  

          The court considered whether, in a
lump sum contract in which the contractor has had a right to inspect the site
before bidding, the risk that the owner’s specifications are inaccurate or
inadequate to perform the job falls on the contractor as a matter of law.  Id. at 1120.  The court concluded that it does not.  Id.
at 1126-27.

          In IT Corp., as does El Paso in
the case before us, the appellee-owner relied on Lonergan v. San Antonio
Loan & Trust Co., 104 S.W. 1061 (Tex. 1907), and Emerald Forest
Utility District v. Simonsen Construction Co., 679 S.W.2d 51 (Tex.
App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.), to support its contention
that the risk falls on the contractor.  IT
Corp., 903 F.Supp. at 1120.

          In Lonergan v. San Antonio Loan
& Trust Co., the Supreme Court of Texas held that a contractor was not
excused from performance under a contract to build a house even though the
plans and specifications that were prepared by the owner’s architect proved to
be defective.  104 S.W. 1061, 1065 (Tex.
1907).  After the nearly completed house
collapsed, the contractor abandoned the job, and the owner sued for breach of
contract.  Id.  at 1062. 
The contractor answered that the house collapsed because the plans and
specifications were defective.  Id.  The court held that the contractor was not
excused from his contractual obligations to build the house because the owner
was not in a better position than the contractor to discover the inadequacies
in the plans and there was no express or implied contractual language that
would justify a conclusion that the parties intended that the owner be
liable.  Id. at 1066.  

          In Emerald Forest Utility District
v. Simonsen Construction Company, the contractor agreed to construct an
underground sewer system according to plans furnished by the owner.  679 S.W.2d 51, 52 (Tex. App.—Houston [14th
Dist.] 1984, writ ref’d n.r.e.). The instructions to bidders had provided for
independent investigation of the work site and stated that the submission of a
bid was to be “conclusive evidence” that the contractor was “fully acquainted
and satisfied” with the quality and quantity of work.  Id. at 53.  During construction, the contractor
encountered “very wet sand conditions.”  Id.
at 52.  There was testimony that an
alternate “wet sand construction method” should have been applied.  Id. 
After the contractor completed the work, the sewer lines
failed.  Id.  The owner sued the contractor.  Id. 
A jury concluded that the lines failed because the design provided
by the owner was insufficient. Id.  The
court examined the contract and held that the owner had not expressly or
implicitly promised that the plans provided were sufficient for the work.  Id. at 53.

          The IT Corp. court, holding in
favor of ITC, concluded that the case before it did not present a situation
similar to those involved in Lonergan or Emerald Forest because
the contractor did not have the same opportunity or ability as the owner to
gather information about the site and to judge the sufficiency of that
information before submitting its bid. 
903 F.Supp. at 1120–21, 1123.

          Here, as in IT Corp., El Paso’s
bidding instructions provided that “[t]he Contractor’s bid shall be based on
the Contract documents as issued, without modification,” that “significant
exceptions to the provisions of the Proposed Contract documents may cause
rejection of the bid,” and that “[t]he Scope of Work is believed to be
complete.” See id. at 1111, 1117–18, 1125.  As with the contractor in IT Corp.,
MasTec visited the site, submitted a lump-sum proposal, and represented that it
was “familiar” with the site.  See id.
at 1111.  Also as the contractor
encountered in IT Corp., it was during performance of the work that
MasTec discovered the errors in El Paso’s specifications and such errors could
not reasonably have been discovered until extensive work was performed.  See id. at 1111-12.  Also similarly, MasTec sued El Paso for
breach of contract, and the jury returned a verdict in favor of MasTec.  See id. at 1112-13.  Further,
similar to the owner in IT Corp., El Paso argues that the contract
placed the risk of differing or unexpected site conditions on MasTec, as the
contractor, that the contract required MasTec to investigate the site prior to
bidding, and that MasTec assumed the risks by representing that it was
“familiar” with the site conditions.  See
id. at 1115–16.  

As in IT Corp., however, MasTec was not in as good a position as
El Paso, as the owner of the Project, to gather critical information concerning
underground foreign crossings in El Paso’s own pipeline corridor and to judge
the sufficiency of the alignment sheets that El Paso provided as a basis for
MasTec’s bid.  El Paso owned the existing
pipeline and the easements along the right-of-way, as well as a second pipeline
in the same corridor.  In addition, El
Paso had access to its “one call” catalog, the contact information for area
landowners, and the alignment sheets on its other pipeline.  Further, the parallel pipeline owned by
Valero, which was purchased from El Paso, had alignment sheets showing most of
the plastic lines. 

           Further, as was the court in IT Corp.,
we are bound by the holding of the United States Supreme Court in Hollerbach
v. United States, 233 U.S. 165, 34 S. Ct. 553 (1914), which was decided on
similar facts and is cited by MasTec. 

          In Hollerbach, the United
States Supreme Court held that the contractor before it was not precluded from
recovering his additional expenses when he discovered, during construction,
deficiencies in owner-provided specifications in a contract that also required
a pre-bid, independent investigation of the jobsite by the contractor.  Id. at 172, 34 S. Ct. at 556.  There, the contractor, Hollerbach, contracted
with the government to remove and rebuild a river dam.  Id. at 167, 34 S. Ct. at 554.  The contract specifications provided, inter
alia, that “[t]he dam is now backed for about 50 feet with broken stone,
sawdust, and sediment to a height of within 2 or 3 feet of the crest, and it is
expected that a cofferdam can be constructed with this stone . . . .”  Id. at 168, 34 S. Ct. at 554.  In addition, “[t]he excavation behind the dam
will be required to go to the bottom . . . .”  Id. The contract also provided, “It is
expected that each bidder will visit the site of this work, . . . and ascertain
the nature of the work, the general character of the river as to floods and low
water, and obtain the information necessary to enable him to make an
intelligent proposal.” Id.  The
contract further provided, 

It is understood and agreed that the quantities given
are approximate only, and that no claim shall be made against the United States
on account of any excess or deficiency, absolute or relative, in the same.  Bidders . . . are expected to examine the
maps and drawings in this office, which are open to their inspection, to visit
the locality of the work, and to make their own estimates of the facilities and
difficulties attending the execution of the proposed contract, including local
conditions, uncertainty of weather, and all other contingencies.

 

Id. at 167, 34 S. Ct. at 554.

          During construction, Hollerbach
discovered that the dam was not backed with broken stone, sawdust, and
sediment, as stated in the specifications. 
Id. at 168, 34 S. Ct. at 554. 
Rather, the backing was composed of “soft, slushy sediment” on top and a
“cribwork” of “sound logs filled with stone” underneath.  Id. 
The trial court refused recovery of the additional expenses
Hollerbach incurred to complete the project. Id. at 169, 34 S. Ct. at
554.  

          The Supreme Court reversed, concluding
that the specifications assured the contractor of the character of the
material—a matter upon which the owner “might be presumed to speak with
knowledge and authority.” Id. at 172, 34 S. Ct. at 556.  The Court further explained,

We think this positive statement of the specifications
must be taken as true and binding . . . . We think it would be going quite too
far to interpret the general language of the other paragraphs as requiring
independent investigation of facts which the specifications furnished by the
[owner] as a basis of the contract left in no doubt.  If the [owner] wished to leave the matter
open to the independent investigation of the claimants, it might easily have
omitted the specification as to the character of the [site] . . . . In its
positive assertion of the nature of this much of the work it made a representation
upon which the claimants had a right to rely without an investigation to prove
its falsity.

 

Id.

          Here, like the owners in IT Corp.
and Hollerbach, El Paso made affirmative assurances in its
Specifications directly bearing on the nature and amount of work to be
performed. El Paso wrote into its Contract that due diligence was exercised in
locating the foreign crossings on El Paso’s alignment sheets—a matter upon
which El Paso might be presumed to speak with knowledge and authority. See
Hollerbach, 233 U.S. at 172, 34 S. Ct. at 556. (“In its positive
assertion of the nature of this much of the work it made a representation upon
which the claimants had a right to rely without an investigation to prove its
falsity.”).  As in Hollerbach, if
El Paso had wished to leave open the matter of foreign crossings to the
independent investigation of MasTec, El Paso could have simply left the due
diligence provision out of the Contract. 
See id. at 172, 34 S. Ct. at 556.

          In sum, the caselaw demonstrates that
a contractor is not precluded, as a matter of law, from recovering against an
owner, under a breach of contract theory, for defective specifications,
notwithstanding lump-sum and pre-bid investigation provisions in the contract,
if the owner was in a better position to know whether its specifications were
sufficient for its intended scope of work and the contract evidences that the
owner made positive assurances concerning the reliability of those
specifications.  See id. at 172,
34 S. Ct. at 556; IT Corp., 903 F.Supp. at 1120-27.[12] 
Even when the contract places the risk of differing or unexpected site
conditions on the contractor, the contractor is not, as a matter of law,
required to bear the risk “that the bid documents misrepresent the nature and
amount of the work to be performed.”  See IT Corp., 903 F.Supp. at 1125.  

          Hence, here, MasTec’s “own contractual
representations and commitments” do not “conclusively preclude any recovery” on
the jury’s finding that El Paso failed to exercise its promised due diligence
under the Contract in locating its underground foreign pipelines.  We conclude that the jury’s findings in Questions
One and Three are not immaterial.  Cf.
Tichacek, 997 S.W.2d at 172 (stating that trial court may disregard jury
answer and enter judgment notwithstanding the verdict if jury finding is
immaterial). We hold that the trial court erred by granting a JNOV in favor of
El Paso.  

          Accordingly, we sustain MasTec’s sole
issue.








CONCLUSION

          We
hold that the trial court erred by granting judgment notwithstanding the
verdict on MasTec’s breach of contract claim. 
We reverse the trial court’s judgment as to this claim and remand for
entry of judgment consistent with the jury’s verdict and for the assessment of
attorney’s fees in favor of MasTec. 

 

 

 

                                                          Laura
Carter Higley       

                                                          Justice

 

Panel consists of Justices Jennings,
Keyes, and Higley.

Justice Jennings, dissenting.

 

 

 











[1]
             “Foreign
crossings” are obstacles that cross the pipeline right-of-way—such as    other pipelines, utilities, roads, rivers,
fences, wells, cables, and concrete structures.

 





[2]
             Although
MasTec was asked to bid on the end of the segment of this line, that lying
between Midway Station and Nueces Bay, the work on that segment was considered
“Optional” (in that it was “to be performed by [MasTec] at [El Paso’s] sole
discretion”) at the time of the bid proposal. The segment constituted new
construction that depended on whether El Paso could successfully acquire the
necessary right-of-way easements. 
Ultimately, MasTec performed this work.





[3]           Pursuant to paragraph 1 of
specification LP-17, the acronym “HDD” means horizontal directional drilling.





[4]           The Contract specifies that the pipeline must be
operational by August 15, 2003.  The jury
heard testimony that El Paso faced owing penalties to a third party of up to
$250,000 per day if the deadline was not met.





[5]           According to the record, “one call” is a centralized
notification system in Texas that began in the 1990s.  Every utility line that goes into the ground
16 inches or greater must be reported when the line is being laid.  The contractor makes one call which notifies
all the registered, affected pipeline operators in the area that they have 48
hours to send out a representative to be “on site” while new pipeline is laid
over theirs.  The representative records
the new pipeline information in his own catalog for future reference with
regard to repair or replacement of his own line.





[6]           The
record reflects that El Paso sold this pipeline to Valero.





[7]           The record does not reflect that MasTec pursued its fraud claim.





[8]           El
Paso’s counterclaim for $104,687.09 in expenses it claims it incurred for items
that were part of MasTec’s scope of work is not part of this appeal.





[9]           Appellees explain in their
brief that the parties to the Contract at issue are MasTec, Inc., and Gulfterra
South Texas, L.P., f/k/a El Paso South Texas, L.P.  MasTec sued El Paso Field Services, L.P., and
Gulfterra.  Appellees assert that El Paso
Field Services, L.P. “was not a party to the contract” and direct us to the
final judgment, which states that “no issues were submitted against El Paso
Field Services, L.P. and MasTec took nothing from it.”  El Paso points out that “MasTec assigns no
error to that part of the Final Judgment.” 
As such, the issue is not before us. 
We note, however, that El Paso Field Services is listed as an appellee
in this appeal.

 





[10]          Referred to in the judgment as
Enterprise South Texas L.P.  El Paso
explains that the second defendant, Gulfterra, “is now known as Enterprise
South Texas, L.P.” because the pipeline was sold by an El Paso affiliate to an
affiliate of Enterprise Products Corporation.  Enterprise is
not listed as an appellee in this appeal. 





[12]          MasTec also directs us to City of Baytown v.
Bayshore Constructors, Inc., 615 S.W.2d 792 (Tex. Civ. App.—Houston [1st
Dist.] 1980, writ ref’d n.r.e.). In Baytown, the court concluded that
the failure of an owner to provide correct or adequate plans and specifications
as are necessary to carry out the work required by a contract constitutes a
breach of the contract.  Id. at
793; but see Interstate Contracting Corp. v. City of Dallas, 407 F.3d
708, 720–21 (5th Cir. 2005) (concluding that Supreme Court of Texas would
require contractual language indicating an intent to shift the burden or risk
to owner to find an owner breached contract by providing defective plans and
also questioning reasoning in Bayshore, which relies on cases in which
contracts indicated such intent).